**FILED**
CLERK, U.S. DISTRICT COURT

**8/7/25**

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ MRV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:25-cr-00651-JFW |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1591(a): Sex Trafficking of Children or By Force, Fraud, or Coercion; 18 U.S.C. § 2423(a): Transportation of a Minor for Sex Trafficking; 18 U.S.C. § 2251(a), (e): Sexual Exploitation of a Child; 21 U.S.C. § 846: Drug Trafficking Conspiracy; 18 U.S.C. § 1956(a)(1)(A)(1): Money Laundering to Promote Specified Unlawful Activity; 18 U.S.C. § 932(b)(1): Conspiracy to Straw Purchase Firearms; 18 U.S.C. §§ 1963, 1594, 2253, 2428, 934, and 924 and 21 U.S.C. § 853: Criminal Forfeiture] |
| AMAYA ARMSTEAD,<br>  aka "Lady Duck,"<br>KEYONDRE YOUNG,<br>  aka "Yunkg Poke,"<br>NAZIZ HARRIS,<br>  aka "richoffdabitchh,"<br>  aka "n4presidential,"<br>  aka "N4,"<br>AVERY AMOAKO,<br>  aka "Handz,"<br>  aka "Hands Secure Payments,"<br>JARED EVANS,<br>  aka "JMoney,"<br>MATHEW BROOKS,<br>  aka "Buddha,"<br>  aka "Vermont Star,"<br>DERRAIL ROBINSON,<br>  aka "P4K,"<br>  aka "Popkorn,"<br>JALON PHILLIPS,<br>  aka "WayMo,"<br>  aka "PayMo,"<br>  aka "Chop Em,"<br>  aka "Waylon,"<br>BRYAN ISREL,<br>  aka "4Loc,"<br>  aka "Figga Foe,"<br>  aka "Notorious FIG," | |

1    TEJOHN GRAY,
     aka "Tiny3,"

2    TOMMY CROCKHAM,
     aka "Tommy Gunz,"

3

           Defendants.

4

5

6      The Grand Jury charges:

7                 COUNT ONE

8            [18 U.S.C. § 1962(d)]

9             [ALL DEFENDANTS]

10 A.    <u>THE ENTERPRISE</u>

11      At times relevant to this Indictment:

12      1.    AMAYA ARMSTEAD, also known as ("aka"), "Lady Duck,"

13 KENYONDRE YOUNG, aka "Yunkg Poke," NAZIZ HARRIS, aka

14 "richoffdabitchh," "n4presidential," and "N4," AVERY AMOAKO, aka

15 "Handz" and "Hands Secure Payments," JARED EVANS, aka "JMoney,"

16 MATHEW BROOKS, aka "Buddha" and "Vermont Star," DERRAIL ROBINSON, aka

17 "P4K" and "Popkorn," JALON PHILLIPS, aka "WayMo," "PayMo," "Chop Em,"

18 and "Waylon," BRYAN ISREL, aka "4Loc," "Figga Foe," and "Notorious

19 FIG," TEJOHN GRAY, aka "Tiny3," TOMMY CROCKHAM, aka "Tommy Gunz," and

20 others known and unknown to the Grand Jury, were members and

21 associates of an organization known as the "Hoovers."

22      2.    The Hoovers organization was a criminal street gang engaged

23 in a variety of illegal activities, including, but not limited to,

24 sex trafficking of minors; sex trafficking through force, fraud and

25 coercion; narcotics trafficking; money laundering; assaults;

26 robberies; kidnappings; and other violent crimes. The Hoovers

27 operated in the Central District of California and elsewhere. The

28 Hoovers organization, including its leaders, members, and associates,

constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Hoovers Enterprise" or "the Enterprise"), that is, a group of individuals associated in fact. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objects of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

3. Cash App is a licensed money services business, which is a financial institution pursuant to 31 U.S.C. § 5312 (a)(2)(R) which is engaged in, or the activities of which affect, interstate or foreign commerce.

B. <u>BACKGROUND OF THE RACKETEERING ENTERPRISE</u>

4. The Hoovers were a criminal street gang formed in the late 1970s and later became a part of the larger "Westside Crips" umbrella. The Westside Crips eventually split into two factions -- the Gangster Crips and the Neighborhood Crips -- and the Hoovers aligned themselves with the Gangster Crips. From the late 1970s to the early 1990s, the Hoovers were known as "Hoover Gangster Crips" or "HGC." To differentiate themselves from other gangs in the area and to establish their own reputation, Hoovers factions or "sets" dropped the "Gangster Crip," from their identity and became the "Hoover Criminal Gangsters" or simply the "Hoover Criminals." Several enemy gangs of the Hoovers also "claim Crip," and the Hoovers believed it no longer made sense for them to hold onto the "Crip" faction identity. The more sovereign Hoovers gang identity gave rise to the especially dangerous Hoovers mentality of being an "Everybody Killer," or "EBK," meaning that members will kill anyone, or commit violence against anyone, who stands in their way of making money or

promoting the Enterprise.  This created an atmosphere of intimidation that allowed the Hoovers to operate with virtual impunity.  Moreover, the pride and power of being associated with the Hoovers enabled and empowered its members and associates to commit criminal offenses that enriched the individuals and furthered the reputation and objectives of the Enterprise.

5.    At the time of this Indictment, all the Hoovers sets, except the Five-Deuce Hoovers, claimed allegiance to the "Hoover Criminal Gangsters" or "HCG."




6.    The Hoovers had many rivals, including but not limited to, the Rollin 30s, Rollin 40s, Rollin 60s, Rollin 90s, Rollin 100s, 5-7 Neighborhood Crips, Menlo Gangster Crips, 102 Budlong Gangster Crips, Hard Time Hustler Crips, 105 Underground Crips, East Coast Crips, 6-2 Brims, and Van Ness Gangster Brims.  Rivalries stemmed from a history of feuds over territory for sex trafficking, territory for narcotics sales, rap music, violence on the streets, and feuds between gang members while they were incarcerated.

7.    The Hoovers had approximately 1,800 members.  The Hoovers claimed territory in the City of Los Angeles bounded by Vernon Avenue to the North, Imperial Highway to the South, the 110 Freeway to the

East, and Vermont Avenue to the West.  South of Manchester Avenue, Hoovers territory extended further west to Normandie Avenue.  There were other pockets of Hoover territory disjointed from this main area, including a portion of Hoover territory east of the 110 Freeway, often referred to by Hoovers as the "Midwest."  The Hoovers' territory largely encompassed the "Figueroa Corridor," a 3.5 mile stretch of Figueroa Street between approximately Slauson Avenue and Century Boulevard, notorious for sex trafficking, prostitution, and other related crimes.  The Hoovers have strongholds over specific hotels and motels in their territory, including the Stadium Inn & Spas, located at 10411 South Vermont Ave, Los Angeles (the "Stadium Inn"), and the One Ten Motel located at 700 West Florence Ave, Los Angeles (the "One Ten Motel").

        8.   The Hoovers comprised numerous subsets, or "sets," which corresponded to streets within Hoovers territory, including, 43rd, 52nd, 59th, 74th, 83rd, 92nd, 94th, 107th, and 112th Street Hoovers. Each of these sets had some distinct nuances for their identities, but they all ultimately represented the "H," or the Hoovers, first and foremost.  For example, a Hoover from 112th Street was considered an "Eleven-Deuce Hoover."  Hoovers paid homage to the Enterprise as a whole and to their specific set.  While Hoovers sets might be friendly with other gangs, such as Grape Street Crips, Black P. Stones, 5-1 Troubles, Shotgun Crips, Swan Bloods, Kitchen Crips, and "Eight Trey" Gangster Crips, they were ultimately most loyal to the Hoovers Enterprise.



9.   The Hoovers adopted the Houston Astros Major League Baseball team logo as their primary symbol, a white "H" in front of an orange star.  The designated color of the Hoovers was orange. Hoovers wore Houston Astros attire and the color orange to show their membership, and to make their presence in their territory known, to maintain a stranglehold on criminal activities therein.





10.   Hoovers also signified their membership in the Enterprise with tattoos reading "H," a star, or other variations of the gang's name, streets, sets, or their monikers.

11.   Each set of the Hoovers also had their own emblems that they used, aside from the Astros Star and "H."  For example, 7-4 Hoovers would use the San Francisco Giants Major League Baseball team's orange "SF" logo to signify "Seven Four."  5-2, 9-2, and 11-2 Hoovers would wear the Detroit Tigers Major League Baseball team's "D" logo to signify "Deuce."

12.   As another means of intimidation and to show membership in the Hoovers Enterprise, Hoovers members flashed hand signs, including using their pointer and middle finger to point down, and their thumb in middle, effectively making an "H."  Depending on which set of the Hoovers the member was a part of, they might also flash the number associated with their set, for example a 4 or a 5.  Gang hand signs were significant as a way for gang members to show their allegiance, membership, and loyalty to the Enterprise.



13.  The Hoovers utilized graffiti or tagging to mark their territory.  Tagging included images of the Hoover hand signs, the Houston Astros star, and the words "Hoover," "Hoovers," and "Vers," which is a shortened version of "Hoovers."  Tagging often included the number associated with their Hoover set, for example a tag might include "512" which showed the 5-1 Troubles and the 5-12 Hoovers were in good standing with one another.  Another common number shown in tagging was "716," which represented the sum of all Hoover set numbers.  Hoovers tagging avoided using specific letters, including "S," because "S" was a letter associated with an enemy of the Hoovers, the Sixties.  Conversely, Hoovers would often add letters, such as "K," to indicate they are "Killers," or include "NK" which is shorthand for "Neighborhood Killer" or "Nap Killer" ("Nap" is a disrespectful reference to Neighborhood Crip gangs, referencing the word "nappy").



14.    To further demonstrate their membership in and allegiance to the Hoovers Enterprise, members would often refer to each other as "Groove," or "Groov," as homage to the gang's origins as "Hoover Groovers."  Members often referred to each other by their gang monikers and might not know each other's legal names.

15.    The Hoovers did not have a formal procedure for joining the gang.  Some members were admitted by virtue of familial connections or geographic location.  Other members were "jumped in," which required the new member to be physically beaten by more established members of the gang to demonstrate toughness and resilience.

16.    Each Hoovers set had senior members who could give orders to other members.  The status of a senior member stemmed from "work" the Hoover had "put in" for the gang.  Widely reputed members such as defendant ARMSTEAD were considered "trophies" in the Hoovers gang, that is, some of the most active Hoovers members, and were permitted to give orders to other members in their set.  Despite this, Hoovers members also worked individually to accomplish the Hoovers' control of criminal activities in their territory.

17.  Associates of Hoovers from other gangs could obtain blessing from the Hoovers to commit crimes in Hoovers territory. Sometimes this involved paying "taxes" to operate in the territory; it might involve being "jumped into" the gang; and other times it involved developing a reputation or "rep" for being a prolific, particularly violent, or skilled criminal, or assisting well-regarded Hoovers in their criminal activities.

18.  At times, various Hoovers sets would have disputes or "beef" with one another set.  But when it was time to "put in work" on behalf of the gang -- including committing crimes such as shooting at rivals, carrying out robberies, or extorting local businesses -- the Hoovers came together under the concept that "no one is bigger than the program," referring to the overall Enterprise.

19.  Older members of the gang would serve as mentors, referred to as "big homies," within the Enterprise.  If a gang member was under the wing of a "big homie," that member took the moniker of the big homie, but as "little homie."  The next generation often took the designation "tiny homie," and the generation after that took "infant."  The "little," "tiny," and "infant" homies all respected the "big homie."  The younger generation of Hoovers were indiscriminately violent against anyone they consider to be an "opp," short for "opponent," that is, someone who disrespected the Hoovers' name or interfered with the Enterprise's moneymaking criminal activities.  Some in the old generation of Hoovers lamented that the young generation lacked a code of conduct.  Many of the older generation Hoovers believed that the younger generation resorted to "gun play," or shootings, far too quickly when a simple assault would

have sufficed.  But the concept of acting "For the Greater Good" of the Hoovers controlled.

20.  Hoovers largely controlled sex trafficking and prostitution in the Figueroa Corridor.  Members and associates of the Enterprise acted as "pimps" (a person who befriends, recruits, trains, and/or panders a person for prostitution) to promote and manage sex trafficking.  Pimps exploited commercial sex acts of victim sex workers, including minors, for the pimp's own personal gain and on behalf of the Enterprise.  Pimps might promote a lavish and powerful lifestyle to entice and coerce their victim sex workers with displays of large sums of money, flashy jewelry, fancy cars, guns, drugs, group affiliation, and parties, among other things.  Pimps also might demonstrate violence and control, including kidnapping, drugging, physical and mental abuse, and enslavement of victims.  The pimps aimed to control their sex workers, both so that the pimp was personally enriched, and also to enhance the reputation of the Enterprise.



21.  Members of the Enterprise facilitated each other's pimping, often referred to as "The Game," by managing and monitoring each other's sex trafficking victims; pooling resources to rent several motel rooms for commercial sex dates; disciplining each other's victims to intimidate the victim and show that the pimp's power extends beyond their own "arm's reach"; driving each other's victims to and from the "blade," the street where victims solicited commercial sex dates; sourcing third parties to create online profiles for sex advertisements; and sending each other money via financial applications, including Cash App, or rideshare rides to transport each other's sex workers for commercial sex dates. Enterprise members worked collectively to maintain a steady presence at Hoovers strongholds, especially at hotels where they engaged in sex trafficking, to keep competitors out of their territory, and to further their monopoly on moneymaking criminal activities in their territory.  To further each other's sex trafficking, Enterprise members also apprised each other of the conditions on various blades, notifying each other of when there were minimal customers (sometimes referring to the blade as "dry"), when there were recruiting opportunities (sometimes referring to "new feet"), and when law enforcement presence was high.

22.  The Enterprise adhered to the rules of "The Game," which a pimp would teach any sex trafficking victim the pimp "turned out," that is, introduced to sex work.  Hoovers pimps taught their victims to maintain absolute loyalty, often literally branding their victims with their monikers to claim them as chattel.  Pimps dictated how a victim interacted with clients ("Johns" or "tricks"), the other sex workers who worked for the pimp (referred to as "wifeys"), and with

the pimp.  A victim was required to remit all proceeds from
commercial sex dates to the pimp.  A victim who did not, or violated
other rules of "The Game" (referred to as being "out of pocket"),
faced discipline, including assaults; berating and public
humiliation; withholding of affection, drugs, or food; draconian
"overtime" hours; or firing.  In exchange, a pimp was expected to
provide protection from other pimps and Johns, clothing, housing,
food, and beauty services.  Sex workers were required to have their
hair and nails done at all times because their grooming was a status
symbol that reflected on her pimp.

23.  To start working for a pimp, a victim was required to pay a
"choosing fee," that is, a payment for the privilege to work for that
pimp.  Victims were taught that once they "chose" a pimp, they were
not permitted to speak to or even look at other pimps, and they would
face grave consequences for violating this rule.  Similarly, if a
victim attempted to leave her pimp, she was required to pay an exit
fee or face grave consequences.

24.  Generally, if a person who was not a Hoover wanted to
engage in pimping or sex trafficking activities in Hoovers territory,
including on the Figueroa Corridor, they were required to be in good
standing with the Hoovers or have Hoovers' permission to do so.  If a
non-Hoover pimp sex trafficked in Hoovers territory without the
Hoovers' authority to do so, that pimp risked being robbed and
assaulted by Hoovers pimps, having his sex worker robbed and
assaulted by Hoovers pimps, or having his sex worker "knocked,"
meaning recruited away from him to work for a Hoover or Hoover-
associated pimp.

25.   Hoovers Enterprise members also worked together to recruit new victims.  Recruitment could occur on social media or in person, and focused on vulnerable minor girls and young women, particularly those who have financial and/or emotional struggles or have run away from home.  To recruit sex workers, Enterprise members utilized various methods of manipulation, including false promises of a luxurious lifestyle, intimidation, and actual or threatened violence. Pimps plied their victims with various drugs that serve different purposes.  For example, oxycodone tended to make victims more compliant, lowered their inhibitions, and kept them warm when soliciting dates on cold nights.  Stimulants such as amphetamines could make a victim more productive and curb her appetite, allowing the pimp to increase the pimp's profit margins by increasing revenue from sex trafficking while spending less on food and other subsistence for sex workers.

26.   Hoovers also continually engaged in distributing controlled substances, including, but not limited to, oxycodone, promethazine with codeine, benzodiazepine, alprazolam, and fentanyl.  Hoovers often referred to promethazine with codeine as "tris," shorthand for "Tris Pharma, Inc.," the pharmaceutical company that manufactured promethazine with codeine.  They often referred to oxycodone pills as "Percs" or "Perks" or "Yercs," which are all shorthand for Percocet, a brand name for oxycodone pills.  Hoovers illegally diverted pharmaceutical drugs by recruiting fake patients to obtain and fill prescriptions for highly-sought-after controlled pharmaceuticals, purchased the drugs from the fake patients, then sold the drugs at a profit.  Enterprise members regularly distributed large quantities of drugs to each other and to others.

27.  The Enterprise maintained a stronghold over certain local businesses that promoted the pattern of crimes committed by the Enterprise, including the House of Hotties, at 8501 South Figueroa Street, Suite 103 in Los Angeles ("House of Hotties"), which was owned and operated by Hoovers and Hoovers associates.  House of Hotties was a clothing store that primarily sold sex work outfits, and Hoovers enterprise members frequently dressed their trafficking victims for work with its offerings.  If a Hoovers member wanted to purchase clothing outside of business hours, they could contact the store owners or managers to open the store specifically for them. Additionally, Hoovers also used the store for drug transactions and stashing contraband.  Hoovers members guarded the store wearing Hoover colors to deter theft.  Shoplifters were assaulted, and the assaults were recorded and posted to social media to deter theft, aggrandize the Hoovers name and reputation for toughness and violence, and reinforce the Hoovers territory.

28.  Hoovers were known to utilize Cash App and Apple Pay as means of receiving and transferring criminal proceeds.  The vanity names on these financial accounts often referenced a Hoovers member's moniker.  Hoovers often directed their sex trafficking victims to deposit the proceeds of their sex work into the Hoover member's Cash App account.  The Hoovers member would then use those proceeds to further promote their criminal activities, such as arranging Uber rides for sex trafficking victims, procuring hotel rooms for dates, and paying for food or condoms.  Sometimes Enterprise members directed sex workers to send Cash App payments to a different Enterprise member, who then funneled the money to the intended recipient, to layer illegal proceeds transactions and frustrate

efforts to trace victims' proceeds to their pimp.  Hoovers Enterprise members also accepted Cash App payments when they sold drugs.

29.  To support their human trafficking and drug trafficking activities, and to maintain control over their claimed "territory," the Enterprise maintained a ready supply of firearms.  Hoovers members shared these firearms and stashed them for one another. Members proudly displayed these firearms in social media posts to maintain and promote the Enterprise's reputation for violence, to intimidate the general community and the women and girls they sought to sex traffic, and to deter rival gang members who threatened to encroach on their territory or knock their sex workers.  The prolific and publicized possession of firearms allows Hoovers to maintain exclusive control of its territory for illicit purposes.



30.  Hoovers members also engaged in acts of violence against members of the community; sex workers who acted "out of pocket," that is, disobeyed their pimp; and rival gang members in the Enterprise's territory.  Participation in violent acts increased one's reputation

in the Enterprise and thus expanded a member's opportunity to profit from illegal activities in the territory.  Additionally, by committing violent acts, Hoovers enhanced the gang's overall reputation for violence, which intimidated citizens and chilled crime reporting, thus allowing Enterprise members to continue their criminal activity.

31.  Many Enterprise members identified as rappers and produced rap music and rap videos.  These songs and videos often glorified the Hoovers, the pimping lifestyle, narcotics sales, and firearm possession, thereby further elevating the reputation of the Enterprise and catalyzing recruitment of sex trafficking victims.



X P4K (Baby Stone Gorillas) X ILLAH - "Real Life" (Official Music Video)

32.  Some Enterprise members did not claim the Hoovers name, but participated in and contributed to the Enterprise, including by "putting in work," which involved criminal activities including shooting or assaulting enemies of the Hoovers; committing robberies; obtaining firearms; distributing drugs; disciplining, recruiting, or

trafficking minors or adults through force, fraud, and coercion; or providing enforcement or look outs at Hoovers strongholds.

C.   THE PURPOSES OF THE ENTERPRISE

33.   The purposes of the Enterprise included, but were not limited to, the following:

a.   Enriching Enterprise members through, among other things, recruiting and maintaining juvenile and adult females through force, fraud, or coercion to engage in commercial sex work; transporting sex workers across state lines to engage in prostitution; distributing illegal narcotics; kidnapping; money laundering; robberies; and conducting other profit-driven illegal activities in Los Angeles and elsewhere;

b.   Maintaining control over illegal activities occurring in Hoovers "territory" within Los Angeles, including keeping the public-at-large in fear of the Enterprise, and in fear of its members and associates through threats of violence and actual violence;

c.   Controlling commercial sex work in Hoovers territory, including in the Figueroa Corridor, through intimidation, violence against sex workers operating in the Figueroa Corridor without a trafficker in the Enterprise, violence against rivals who attempted to sex traffic in the Figueroa Corridor or recruit away sex workers belonging to Enterprise members, and congregation in the Figueroa Corridor to show a strong and consistent Hoovers presence; and

d.   Preserving, protecting, and expanding the power of the Enterprise by broadcasting acts and threats of violence on social media platforms to reach the broader public and elevate the Hoovers reputation for violence.

D.   THE MEANS AND METHODS OF THE ENTERPRISE

34.   The means and methods by which defendants and other Enterprise members and associates conducted and participated in the affairs of the Hoovers Enterprise included the following:

a.   Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors by targeting and recruiting children in the foster care system, runaways, and children who grew up in and around the Figueroa Corridor, where commercial sex was normalized and highly visible, among others;

b.   Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors by providing them with false identification cards to facilitate interstate travel and to present to law enforcement if they were caught performing commercial sex;

c.   Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors and young adults by projecting a lavish lifestyle, real or illusory, in person and on social media to recruit vulnerable persons and dupe them to believe they too would enjoy that lifestyle if they worked for an Enterprise pimp;

d.   Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, or coercion by utilizing terror and intimidation tactics, such as forming "pimp circles" where several Enterprise members closely encircled a victim, aggressively attempted to make eye contact, and prevented the sex trafficking victim from leaving until she "chose" one of the pimps by looking them in the eye;

e.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, or coercion by kidnapping sex workers who were not controlled by a Hoover Enterprise pimp, bringing them back to Hoover territory, and forcing them to work for a Hoover Enterprise pimp.

f.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by threatening physical violence or perpetrating physical violence on the victim as a means of discipline or enlisting another Enterprise member to assault the victim;

g.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by posting to social media videos and photographs of their assaults on others to intimidate their victims and ensure their compliance in performing commercial sex for their pimps' and the Enterprise's enrichment;

h.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by pimping their victims at certain Hoovers strongholds, such as the Stadium Inn, where they maintained control over their victims with the steady presence of other Hoovers members, often wearing Hoovers gang colors and attire, creating an atmosphere of intimidation and an invisible perimeter to prevent victims from leaving;

i.    Enterprise members transported minors and adults across the country to sex traffic them, including throughout California, Arizona, Colorado, Nevada, Illinois, Nebraska, Pennsylvania, Florida, and New York, among other states;

1          j.   Enterprise members conspired to commit, attempted to

2   commit, and committed drug trafficking of controlled substances,

3   including oxycodone, promethazine with codeine, benzodiazepine,

4   alprazolam, and fentanyl, providing each other with drugs to sell to

5   third parties and to distribute to sex trafficking victims to gain

6   their compliance and breed addiction, making them more compliant and

7   reliant on their traffickers;

8          k.   Enterprise members conspired to commit, attempted to

9   commit, and committed drug sales to Johns via their sex trafficking

10  victims to extract greater profits from commercial sex dates;

11         l.   Enterprise members directed their sex trafficking

12  victims to remit all commercial sex proceeds to their trafficker via

13  cash or other financial banking applications, such as Cash App and

14  Apple Pay.  Some Enterprise members put their Cash App or Apple Pay

15  accounts on their victims' phones and disguised their profile in

16  their victim's name and photograph to make the Johns believe that

17  they were paying the sex worker when in reality the funds were going

18  directly to the pimp;

19         m.   Enterprise members knowingly conducted financial

20  transactions, including over Cash App, which involved the proceeds of

21  sex trafficking and drug trafficking, with the intent to promote and

22  conceal their criminal activities; and

23         n.   Enterprise members committed, attempted to commit, and

24  threatened to commit acts of violence to protect and expand the

25  Enterprise's territory and criminal operation, and to intimidate the

26  general public.  They often posted videos and photographs of these

27  threats and violence to social media to magnify their effect.

28



ARMSTEAD   YOUNG   HARRIS   AMOAKO

EVANS   BROOKS   ROBINSON   PHILLIPS

ISREL   GRAY   CROCKHAM

E.   THE RACKETEERING CONSPIRACY

35.   Beginning no later than in or around February 2021 and continuing through August 7, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARMSTEAD,

22

YOUNG, HARRIS, AMOAKO, EVANS, BROOKS, ROBINSON, PHILLIPS, ISREL, GRAY, and CROCKHAM, and others known and unknown to the Grand Jury, each being employed by and associated with the Hoover Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Hoover Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), which pattern of racketeering consisted of:

     a.   Multiple acts involving:

       i.   Dealing in controlled substances, chargeable under California Penal Code, Sections 11370, 11351, 11350, 11352, 11377, 11378, 182, 664, 21a, and 31;

       ii.  Robbery, chargeable under California Penal Code, Sections 182, 211, 664, 21a, and 31.

       iii. Kidnapping, chargeable under California Penal Code, Sections 207(a), 664, 182, 21a, and 31.

     b.   Multiple acts indictable under:

       i.   Title 18, United States Code, Section 1591 (relating to sex trafficking of children or by force, fraud, or coercion);

       ii.  Title 18, United States Code, Section 2423 (relating to the transportation of minors for criminal sexual activity);

1          iii. Title 18, United States Code, Section 2421

2  (relating to the transportation of adults in interstate commerce for

3  prostitution or sexual activity);

4          iv.  Title 18, United States Code, Section 2422

5  (relating to coercion and enticement);

6          v.   Title 18, United States Code, Section 1952

7  (relating to racketeering);

8          vi.  Title 18, United States Code, Section 1956

9  (relating to the laundering of monetary instruments);

10          vii. Title 18, United States Code, Section 932

11  (relating to straw purchasing of firearms);

12          viii.   Title 18, United States Code, Section 1028

13  (relating to fraud and related activity in connection with

14  identification documents); and

15      c.   Multiple offenses involving the distribution of

16  controlled substances in violation of Title 21, United States Code,

17  Sections 841, 846, and 859.

18      36.  It was further part of the conspiracy that each defendant

19  agreed that a conspirator would commit at least two acts of

20  racketeering activity in the conduct of the affairs of the

21  enterprise.

22  F.   OVERT ACTS

23      37.  On or about the following dates, in furtherance of the

24  conspiracy and to accomplish its objects, defendants ARMSTEAD, YOUNG,

25  HARRIS, AMOAKO, EVANS, BROOKS, ROBINSON, PHILLIPS, ISREL, GRAY,

26  CROCKHAM, and others known and unknown to the Grand Jury, committed

27  the following overt acts, among others, within the Central District

28  of California and elsewhere:



Overt Act No. 1:    On an unknown date, at least four women were branded with tattoos of defendant ARMSTEAD's moniker, "Lady Duck."







Overt Act No. 2:    On an unknown date, at least two people were branded with tattoos of defendant AMOAKO's moniker, "Handz."





Overt Act No. 3:   On an unknown date, at least three people were branded with tattoos of a symbol or wording that defendant ISREL used to identify himself.

  

## 1.   2021: Enterprise Members Sex Trafficked, Recruited, and Advertised Sex Workers and Trafficked Drugs

Overt Act No. 4:   On February 9, 2021, while driving in a car together, defendants ARMSTEAD and EVANS possessed with the intent to distribute promethazine, carisoprodol, counterfeit oxycodone that in fact contained fentanyl, Xanax, a scale, and more than $9,000 in cash.

Overt Act No. 5:   On April 18, 2021, defendant ISREL physically assaulted his sex worker Victim 1 in Las Vegas, Nevada, striking her with a closed fist in the back of the head.

Overt Act No. 6:   On May 16, 2021, using coded messages on Instagram, defendant ISREL recruited an unidentified female to work for him, boasting that he was building a new stable of women and claiming that he had a problem with one of his previous sex workers. The unidentified female offered to beat up the problematic sex worker, but defendant ISREL, using coded language, advised that he would catch her and assault her himself.

<u>Overt Act No. 7:</u>   On May 31, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell oxycodone pills at 30 milligram strength.

<u>Overt Act No. 8:</u>   On August 19, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell promethazine with codeine.

<u>Overt Act No. 9:</u>   On September 4, 2021, using coded language on text messages, defendant AMOAKO ridiculed his unidentified sex trafficking victim for thinking that she only needed to pay him one time and warned her to watch her mouth before he "breaks her jaw."

<u>Overt Act No. 10:</u>   On September 6, 2021, using coded language on TextNow, defendant AMOAKO told an unidentified victim he would get her more condoms when she finished using the three condoms she had.

<u>Overt Act No. 11:</u>   On September 26, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell a full prescription pint of promethazine with codeine for $1,400.

<u>Overt Act No. 12:</u>   On December 9, 2021, defendant ARMSTEAD possessed with the intent to distribute promethazine, carisoprodol, oxycodone, hydrocodone, and $6,000 in cash.

**2.   2022: Enterprise Members Sex and Drug Trafficked and Attempted to Kidnap Victims for Sex Work**

(a)   <u>Enterprise Members Recruited Sex Workers, Distributed Drugs, and Brandished Guns to Elevate the Hoover Reputation for Violence</u>

<u>Overt Act No. 13:</u>   On January 19, 2022, defendant CROCKHAM posted a video on his Instagram story showing him driving a car while an unidentified co-conspirator in the passenger seat held a gun in his lap and threw gang signs.

27

1      Overt Act No. 16:   On May 5, 2022, to promote his own

2  reputation as a pimp and elevate the reputation of the Hoovers

3  Enterprise, defendant CROCKHAM posted a photograph on Instagram

4  showing him fanning a large amount of cash.  There is a "crown" emoji

5  on the photograph, indicating that defendant CROCKHAM self-identifies

6  as a pimp.

7      Overt Act No. 17:   On June 22, 2022, using coded language in

8  Instagram messages, defendant ISREL told another Instagram user that

9  he beats up his sex workers with his words, instead of his hands.

10     Overt Act No. 18:   On June 28, 2022, using coded language on

11 text messages, defendant AMOAKO told an unidentified person he just

12 sold oxycodone.

13     Overt Act No. 19:   On July 4, 2022, using coded language on

14 text messages, defendant AMOAKO told an unidentified person that he

15 was selling pills, believed to be oxycodone, on Manchester and

16 Figueroa.

17     Overt Act No. 20:   On July 5, 2022, using coded language on

18 text messages, defendant AMOAKO told an unidentified person that he

19 had oxycodone for sale.

20     Overt Act No. 21:   On July 8, 2022, using coded language in

21 Instagram messages, defendant ISREL attempted to recruit a sex worker

22 by explaining he only beats sex workers when they steal from him or

23 disrespect him, but not if they do not generate a certain amount of

24 money.

25     Overt Act No. 22:   On July 16, 2022, defendant CROCKHAM posted

26 an Instagram story paying homage to the Hoovers with an image setting

27 forth all the Hoovers sets by number and set moniker, with a message

28

at the bottom reading, "716 Gang or Don't Gang," pledging loyalty to the Hoovers.

   (b) <u>Defendant GRAY Attempted to Kidnap Victims for Sex Trafficking</u>

 <u>Overt Act No. 23</u>: On April 21, 2022, defendant GRAY and two unindicted co-conspirators drove into the area of West 6th Street and North G Street, in San Bernardino, California, a street notorious for prostitution activities.

 <u>Overt Act No. 24</u>: On April 21, 2022, defendant GRAY and two unindicted co-conspirators followed suspected sex workers on a known blade in San Bernardino, pulled over their car, and attempted to force two female victims into their car.  Defendant GRAY grabbed one victim, but she broke free.  Then defendant GRAY reversed the car to position it closer to his co-conspirator, who was restraining another victim.  Defendant GRAY exited the car and helped his co-conspirator physically force the woman into the car.  The woman ultimately broke free and ran away.

   (c) <u>Defendant AMOAKO Sex Trafficked Victim 2 Through Force, Fraud, and Coercion from 2022 through 2023</u>

 <u>Overt Act No. 25</u>: On April 6, 2022, in coded text messages, defendant AMOAKO threatened Victim 2, his sex trafficking victim, that he was watching her and that she better stay alert in the car where he saw her sitting.

 <u>Overt Act No. 26</u>: On July 24, 2022, through July 25, 2022, using coded text messages, defendant AMOAKO threatened Victim 2, "Imma fracture every bone in yo face."  He then shifted to guilting her, asking, "You really g[o]ne leave DADDY in this cold world . . . Knowing you all I got."  Defendant AMOAKO also claimed that he "elevate[d]" Victim 2 every day.  When defendant AMOAKO did not

receive his desired responses, he shifted back to threats, swearing

on the Hoovers that he would remember this and adding, "Fuck u bitch

die out here on the blade" and "Hope a trick rape [a]nd kill u leave

u on the side of a freeway." He also threatened to kick down Victim

2's mother's door and noted the apartment number to show he knew

where she lived. When Victim 2 said she would go to the police,

defendant AMOAKO threatened to have her assaulted for snitching and

vowed he would wire her jaw shut. He further threatened, "Yeah

better watch yo dates might be yo last one."

Overt Act No. 27: On September 12, 2022, using coded text

messages, Victim 2 told defendant AMOAKO that she gave him more than

$1,000 in commercial sex proceeds, hoping that it would put her back

in good standing with him. Defendant AMOAKO replied that her job was

not done and that she needed to continue contributing to the "team"

effort. Later, when Victim 2 wrote to defendant AMOAKO, "Daddy I

love you," defendant AMOAKO replied that she was dead to him.

Overt Act No. 28: On September 16, 2022, in coded text

messages, defendant AMOAKO again threatened harm to Victim 2's mother

and said he would go to her residence.

Overt Act No. 29: On June 17, 2023, using coded text messages,

Victim 2 told defendant AMOAKO that she wanted to come back to him

and prove herself. Defendant AMOAKO insisted that if she returned,

she would have to follow his rules and instructed her on her role in

his stable, including making the other sex workers feel welcome.

Defendant AMOAKO said that if she followed his program, Victim 2

would be "granted wit everything [she] wished for," And added "I

needa mold u back into the way I want u."

(d)   Defendant ISREL Sex Trafficked Victim 3 Through Force, Fraud, and Coercion from 2022 through 2024

Overt Act No. 30:   Between at least December 1, 2022 and February 17, 2025, defendant ISREL sex trafficked adult Victim 3 through threats of force, fraud, and coercion.

Overt Act No. 31:   On May 29, 2023, in Las Vegas, Nevada, Victim 3 got into her car, and as she was attempting to leave defendant ISREL, he threw a large alcohol bottle through her rear passenger window.

Overt Act No. 32:   On November 17, 2023, using coded messages on Instagram, defendant ISREL directed Victim 3 to rob a John in Las Vegas.  Victim 3 informed defendant ISREL that the John had a Rolex watch.  She said that she would also take $1,750 in chips, $2,800 in cash, and $450 in Apple Pay.  Victim 3 confirmed that the John took the watch off and she "got it."

Overt Act No. 33:   On February 10, 2024, defendant ISREL physically assaulted his sex trafficking victim, Victim 3, punching and kicking her in a bathroom.  After Victim 3 fell back onto the toilet, defendant ISREL continued to beat her on her back and side when she curled into a ball to protect herself.

Overt Act No. 34:   On October 23, 2024, using coded language over text messages, Victim 3 reported to defendant ISREL that she "broke" a date for $3,200, and that she made $3,800 in total for the night.  Defendant ISREL directed Victim 3 to send him the money on Cash App.

Overt Act No. 35:   Between approximately October 24, 2024 and October 25, 2024, at defendant ISREL's direction, Victim 3 sent defendant ISREL approximately $2,400 on Cash App.

1     <u>Overt Act No. 36:</u>   On October 25, 2024, using coded language

2  over text messages, defendant ISREL instructed Victim 3 to pick up

3  oxycodone from his drug contact at the Venetian hotel.

4     <u>Overt Act No. 37:</u>   On October 25, 2024, using coded text

5  messages, defendant ISREL told Victim 3 that he was saving money and

6  had a goal to save $100,000 to $200,000 so that Victim 3 could take a

7  break from working for him in order to have defendant ISREL's baby.

8  Victim 3 agreed that she would not want to work in sex trafficking

9  while pregnant.  Shortly after, Victim 3 reported to defendant ISREL

10 that she was going up to a hotel room for a commercial sex date, and

11 later reported that she made $700.

12    <u>Overt Act No. 38:</u>   On or before October 31, 2024, defendant

13 ISREL assaulted Victim 3 and made her face bleed.  Victim 3 had made

14 $20,000 and had given all the money to defendant ISREL.

15    <u>Overt Act No. 39:</u>   On November 6, 2024, using coded text

16 messages, defendant ISREL and Victim 3 discussed at least three

17 luxury watches that Victim 3 has stolen for defendant ISREL.

18 Defendant ISREL informed Victim 3 that he was on his way to pick her

19 up.

20    <u>Overt Act No. 40:</u>   On November 11, 2024, defendant ISREL asked

21 Victim 3 if she had stolen a certain watch from a specific hotel

22 because he planned to wear it out of the house.

23    <u>Overt Act No. 41:</u>   On or before November 25, 2024, defendant

24 ISREL ripped out Victim 3's hair, hit her in the face, and caused her

25 knees to bleed from dragging her.

26    <u>Overt Act No. 42:</u>   On December 21, 2024, using coded text

27 messages, Victim 3, trying to satisfy defendant ISREL's desire for

28 money, told defendant ISREL that she was willing to solicit sex work

on the Figueroa Corridor until Christmas Day, if she could not find sex work in the Las Vegas hotels.  Defendant ISREL applied the "love" reaction to the message and told her to keep the faith that she could make money.  Victim 3 reported to defendant ISREL the hotels in which she tried to find dates and reported how much money she had made.

Overt Act No. 43:   On December 22, 2024, defendant ISREL received a report from Victim 3, using coded language over text messages, on which hotels she had attempted to enter, explained that she had been out 11 hours that day, had worked twelve hours the day before, but kept getting kicked out of hotels.

Overt Act No. 44:   On December 29, 2024, using coded language over text messages, Victim 3 told defendant ISREL that she was on a commercial sex date and that she intended to steal a watch for defendant ISREL from the safe in the John's room.  Defendant ISREL instructed Victim 3 to close the safe after she took the watch so the victim did not notice the theft until the morning.  He also instructed her to calmly leave the room because the security cameras would record her leaving.  Approximately ten minutes later, Victim 3 asked defendant ISREL to pick her up, and defendant ISREL again reminded her to close the safe.

Overt Act No. 45:   On December 29, 2024, using coded language over text messages, defendant ISREL apologized for breaking Victim 3's nose after she pointed a gun at him.

Overt Act No. 46:   On January 4, 2025, in a voice message on Instagram using coded language, defendant ISREL acknowledged to Victim 3 that he had hit her and said he would not do it again. After briefly acknowledging his own violence, defendant ISREL claimed that Victim 3 knew he was not a "bad person" because if he was, she

would have pressed domestic violence charges and would not have returned to him.  Defendant ISREL threatened that if Victim 3 could not "control [her] anger," and continued to report his violence to police, he would leave her.

(e)  Defendant EVANS Sex Trafficked Victim 4 Through Force, Fraud, and Coercion Between 2022 and 2025

Overt Act No. 47:  Between at least December 1, 2022 and January 5, 2025, defendant EVANS sex trafficked Victim 4 through threats of force, fraud, and coercion.

Overt Act No. 48:  On an unknown date, Victim 4 was branded with a tattoo of "J$," in reference to defendant EVANS's moniker, on her face.  During part or all of the time when defendant EVENS trafficked Victim 4, Victim 4 had shared her location via her cellphone with defendant EVANS.

Overt Act No. 49:  On July 1, 2024, in coded text messages, defendant EVANS asked Victim 4 to report when she had completed her commercial sex dates, and Victim 4 replied when she had done so.

Overt Act No. 50:  On August 7, 2024, in coded text messages, Victim 4 reported to defendant EVANS that she had made $800 on a commercial sex date and that the money was on her Cash App. Defendant EVANS responded, "Great night."  Victim 4 reported that she was going to see another sex customer who had $600 for her.

Overt Act No. 51:  On the early morning of August 9, 2024, defendant EVANS received from Victim 4 $800 in sex trafficking proceeds over Cash App.

Overt Act No. 52:  On October 17, 2024, defendant EVANS, while driving a vehicle, struck Victim 4, and screamed and berated her for at least 40 minutes.  Multiple times, defendant EVANS threatened to

beat her and hit her in the face.  Defendant EVANS told Victim 4 that she owed him money and referred to previously beating her for being a liar.  Defendant EVANS threatened Victim 4 and stated, through coded language, that regardless of where Victim 4 went in Los Angeles, defendant EVANS would "groove" her, referring to following and assaulting her.  Defendant EVANS repeatedly reminded Victim 4 of his status as a pimp to further intimidate her.

Overt Act No. 53:  On November 19, 2024, in coded text messages, defendant EVANS told Victim 4 that she was his number one sex worker and that his other sex workers were just part of "the game," but that he loved her and wanted her to be able to decrease her hours doing sex work.

Overt Act No. 54:  On November 22, 2024, defendant EVANS received a text message from Victim 4 with a screenshot of someone paying Victim 4 $83.

Overt Act No. 55:  On November 24, 2024, through coded text messages, defendant EVANS received reports from Victim 4 of at least five commercial sex dates, inquiries from Victim 4 asking defendant EVANS if he wanted her to go to another location or keep working where she was, a report from Victim 4 that she had just sent defendant EVANS $80 on Cash App, and Victim 4's projection that, "If I keep going I can make 1500."

### 3. 2023: Enterprise Members Sex and Drug Trafficked, and Committed Assaults in Furtherance of the Enterprise

(a) Enterprise Members Worked Together to Sex Traffic Victims and to Instill Fear and Promote the Hoovers' Reputation for Violence

<u>Overt Act No. 56:</u>  On January 1, 2023, using coded language on Instagram, defendant ROBINSON posted an advertisement to "apply" to be his sex worker, noting that all applicants must be obedient.

<u>Overt Act No. 57:</u>  On February 3, 2023, using coded language in Instagram messages, defendant ARMSTEAD told defendant ISREL that a sex worker working for defendant ARMSTEAD was only making $500, and because the room cost $120 and the sex worker needed clothing, defendant ARMSTEAD decided to leave the sex worker on Figueroa Street.

<u>Overt Act No. 58:</u>  On February 16, 2023, using coded language on Instagram, defendant ISREL instructed an unindicted co-conspirator on how to pimp, including moving sex workers around to different states.

<u>Overt Act No. 59:</u>  On March 24, 2023, using coded language on Instagram, defendant CROCKHAM posted an advertisement on Instagram selling promethazine with codeine.

<u>Overt Act No. 60:</u>  On May 27, 2023, using coded language on Instagram messages, defendant AMOAKO asked defendant ISREL if defendant ISREL knew any "good carpets," referring to sex workers who primarily work in hotels and/or casinos.

<u>Overt Act No. 61:</u>  On June 26, 2023, using coded messages on Instagram, defendant ROBINSON recruited a sex worker, enticing her by offering that she could go on tour with him if she started working for him.  Defendant ROBINSON stated that his most motivated sex

36

workers would be going with him, while some stayed back and worked the Figueroa Corridor.

Overt Act No. 62:   On July 5, 2023, in a photograph posted on Instagram, defendants ROBINSON and PHILLIPS, along with an unidentified co-conspirator, fanned cash proceeds which the coded caption to the photograph identified as sex trafficking proceeds.



Overt Act No. 63:   On July 7, 2023, through coded language on Instagram, defendant ROBINSON told an unidentified co-conspirator that defendant ROBINSON was going to go traffic his sex worker and advised the unidentified co-conspirator to call defendant PHILLIPS so that defendant PHILLIPS could help him make money.

Overt Act No. 64:   On July 11, 2023, defendant ARMSTEAD posted a video of herself beating a woman in a convenience store, holding her down by the hair and repeatedly kicking and kneeing her while demanding that the woman apologize for "dissin the set," and yelling "on Hoovers" as she beat her.  The woman shouts that she's pregnant, but defendant ARMSTEAD continues to beat her, as someone off camera tells defendant ARMSTEAD the assault is being captured on surveillance cameras.

Overt Act No. 65:   On September 8, 2024, using coded messages on Instagram, defendant PHILLIPS recruited an unidentified sex worker, promising her "All I need is 30 days we gone have 25,000."

Overt Act No. 66:   On October 26, 2023, using coded language on Instagram messages, defendant AMOAKO explained to an unidentified co-conspirator that his goal was for his sex workers to make $1,500 per night but he accepted $1,000.

Overt Act No. 67:   On November 23, 2024, using coded messages on Instagram, defendant PHILLIPS asked defendant ROBINSON to connect him with a drug dealer from Grape Street, an ally gang, to sell defendant PHILLIPS a pint of promethazine.  Defendant ROBINSON agreed to contact him immediately.

Overt Act No. 68:   On December 5, 2023, using coded messages on Instagram, defendant PHILLIPS bragged to an unidentified female that he had broken away from the police, hopped a fence, and evaded arrest.

Overt Act No. 69:   On December 28, 2023, using coded messages on Instagram, defendant ROBINSON told defendant PHILLIPS that he had just sent his sex workers to the Figueroa Corridor.

Overt Act No. 70:   On December 29, 2023, using coded language on Instagram, defendant AMOAKO told an unidentified potential drug customer that he had oxycodone for sale.

Overt Act No. 71:   On December 29, 2023, using coded language on Instagram, defendant AMOAKO warned defendant BROOKS regarding the presence of rival gang members in or around their territory. Defendant BROOKS thanked defendant AMOAKO for looking out.

Overt Act No. 72:   In November or December 2023, defendants GRAY, HARRIS, and BROOKS assaulted a pimp who was in Hoovers

territory without Hoovers' permission.  Defendant PHILLIPS filmed the assault.  Defendant PHILLIPS and an unindicted co-conspirator stole the pimp's car and moved it to an alley where other Hoover members broke it down and sold the pieces.

> (b)  Defendant AMOAKO Sex Trafficked Victim 5 Through Force, Fraud, and Coercion

Overt Act No. 73:    On an unknown date, Victim 5 was branded with a tattoo of "Handz Secure Payments," in reference to defendant AMOAKO's moniker, on her buttocks.

Overt Act No. 74:    On June 21, 2023, defendant AMOAKO and Victim 5 had an argument and Victim 5 briefly left defendant AMOAKO. Over coded text messages, defendant AMOAKO told Victim 5 that she had not given him a chance, implored her to come back, and told her to tell the people who picked her up that he would give them gas money to return her.  Victim 5 ultimately replied, "I'm sorry daddy," and promised that she was not leaving him.  Preparing her for more sex work, defendant AMOAKO ordered that Victim 5 would get waxed and have her hair and nails done and that they had "a mission to accomplish" together.

Overt Act No. 75:    On July 6, 2023, through coded text messages, defendant AMOAKO ordered Victim 5 to turn on her location monitoring so defendant AMOAKO could track her location.

Overt Act No. 76:    On July 20, 2023, defendant AMOAKO pleaded with Victim 5 to continue working for him, telling her he had no one else, that she was exactly what he needed, and that by leaving she was giving up on their collective "mission" and plans together. Victim 5 reminded defendant AMOAKO that he had left her before and that it had undermined her confidence.  Defendant AMOAKO replied that

1   he only wanted to "encourage" and "motivate" her.  Victim 5 continued
2   to work for defendant AMOAKO.

3       Overt Act No. 77:   On August 13, 2023, using coded text
4   messages, defendant AMOAKO berated Victim 5 for disobeying his rules
5   of pimping and noted that Victim 5 did not act out when defendant
6   AMOAKO had another sex worker working for him.  Defendant AMOAKO
7   demanded money from Victim 5 and ordered her to stop wasting his
8   time.  He continued to berate her, claiming she was inferior to his
9   other sex workers, that she would always fail, and that he would get
10  other sex workers to ridicule her.  Defendant AMOAKO then demanded
11  $500 from Victim 5 for the value of his time, giving her an ultimatum
12  that she could pay him or stop working on the Figueroa Corridor.
13  Victim 5 agreed to pay defendant AMOAKO after her commercial sex
14  date.  Defendant AMOAKO, thinking that Victim 5 had lied about her
15  location, threatened, "Now imma slap the shit outta u for lying," and
16  ordered her to turn on her location monitoring.  Defendant AMOAKO
17  also claimed that Victim 5 paying him was effectively paying herself
18  because he was "elevat[ing]" her.

19      Overt Act No. 78:   On February 12, 2024, using coded text
20  messages, defendant AMOAKO told Victim 5 that she was "fired" for
21  disrespecting him and the other sex workers who worked for him.
22  Later the same day, he told her, "Aye bitch figure it out where my
23  money coming from."  Defendant AMOAKO added that he did not want to
24  see Victim 5 until she had $1,500 for him and sent him a photograph
25  of the money first.  Defendant AMOAKO continued to berate Victim 5,
26  calling her "trash" and claiming that his new sex worker was
27  superior.

28

(c)  Defendant ROBINSON Sex Trafficked Victim 6 Through
Force, Fraud, and Coercion

Overt Act No. 79:  On June 30, 2023, in coded messages on
Instagram, defendant ROBINSON ordered Victim 6 to obey his
instructions, threatening that he would put his "foot" on her "neck"
to enforce his pimping "instructions."

Overt Act No. 80:  On July 3, 2023, Victim 6 sent a $100 Cash
App payment to defendant PHILLIPS's Cash App account, which was
intended for defendant ROBINSON.

Overt Act No. 81:  On July 11, 2023, in coded messages on
Instagram, defendant ROBINSON threatened to "slap" Victim 6 because
he did not approve of her Instagram post about her "feelings," which
reflected poorly on his brand as a pimp.

Overt Act No. 82:  On July 11, 2023, using coded language in
three voice messages on Instagram, defendant ROBINSON told Victim 6
she needed to pay him his $2,500 exit fee if she didn't want to work
for him anymore, threatening "I'll beat you up.  Do you like a dog at
that.  I'm going to fuck you up, it's not going to be one slap.  It's
going to be multiple cause I had to tell you multiple times . . . I'm
gonna beat you the fuck up."  In another coded audio message,
defendant ROBINSON demanded that Victim 6 make $1,000 doing
commercial sex work, warning her that she couldn't go anywhere where
he couldn't "catch" her or "find" her, and alluded to a previous time
he assaulted her, saying, "When I see you it's going to be a
different story.  Just like when I seen you at the store you knew I
was going to do something to you."

Overt Act No. 83:  From July 21, 2023 through August 7, 2023,
through coded messages on Instagram, defendant ROBINSON monitored

Victim 6's commercial sex dates, earnings, and movements, and Victim 6 checked in with him to report her earning, locations, and when defendant ROBINSON could come to her hotel room to collect her proceeds from commercial sex work.

Overt Act No. 84:    On July 27, 2023, defendant ROBINSON distributed marijuana to Victim 6 at the hotel where she was doing commercial sex dates.

Overt Act No. 85:    On August 1, 2023, through coded messages on Instagram, defendant ROBINSON directed Victim 6 to send her commercial sex proceeds to him via Cash App, and provided defendant PHILLIPS's Cash App account information.

Overt Act No. 86:    On August 6, 2023, defendant PHILLIPS received $250 from Victim 6 in defendant PHILLIPS's Cash App account, intended for defendant ROBINSON, as defendant ROBINSON instructed.

Overt Act No. 87:    On August 21, 2023, defendant ROBINSON sent Victim 6 a coded audio message on Instagram threatening to beat her and telling her that she could pay the $2,500 exit fee and do whatever she wanted, but until then, she was under his control. Defendant ROBINSON further threatened to beat her in front of "everyone" to humiliate her.

　　　　(d)    Defendant ROBINSON Sex Trafficked Victim 7, a then-16-Year-Old Girl

Overt Act No. 88:    In and around July 2023, defendant ROBINSON sex trafficked Victim 7, a then-16-year-old girl.

Overt Act No. 89:    In and around July 2023, defendant ROBINSON had sexual intercourse with Victim 7.

Overt Act No. 90:    In and around July 2023, defendant ROBINSON told Victim 7 that she had to pay him $2,500 in order for him to be

her pimp, and that she must make $1,000 per day through commercial sex work.

Overt Act No. 91:    In and around July 2023, defendant ROBINSON told Victim 7 he would physically assault her if she did not make $1,000.

Overt Act No. 92:    In and around July 2023, defendant ROBINSON beat one of his sex trafficking victims in front of Victim 7.

Overt Act No. 93:    In and around July 2023, defendant ROBINSON texted Victim 7 saying she had paid him $500, but needed to pay him an additional $2,000, after which she would be his property.

Overt Act No. 94:    In and around July 2023, 2023, defendant ROBINSON texted Victim 7 asking how many commercial sex acts she had completed and how much money she had made.

Overt Act No. 95:    In and around July 16, 2023, at defendant ROBINSON's direction, Victim 7 made two Cash App payments to defendant PHILLIPS's Cash App account totaling $120, which were the proceeds of defendant ROBINSON's sex trafficking of Victim 7.

    (e) <u>Defendant PHILLIPS Sex Trafficked Victim 8 Through Force, Fraud, and Coercion from September 2023 through February 2024</u>

Overt Act No. 96:    On September 2, 2023, through coded Instagram messages, defendant PHILLIPS directed Victim 8 to go to the blade and solicit commercial sex dates, and to let him know when she returned.

Overt Act No. 97:    On September 3, 2023, through coded Instagram messages, Victim 8 advised defendant PHILLIPS that she secured a commercial sex date.  Defendant PHILLIPS sent her a screenshot of his Cash App account information, and Victim 8 paid him $120 on Cash App.

1    <u>Overt Act No. 98:</u>   On September 5, 2023, through coded
2    Instagram messages, defendant PHILLIPS asked Victim 8 if she had
3    caught any more dates or had advertised her sex services online.
4    Over the next month, defendant PHILLIPS continued to ask her multiple
5    times a day if she had caught commercial sex dates and demanded that
6    she should be making more than $500 a day.

7    <u>Overt Act No. 99:</u>   On January 2, 2024, through coded Instagram
8    messages, Victim 8 reported that she caught a date.   Throughout the
9    rest of the month, defendant PHILLIPS demanded payment for Victim 8's
10   sex work.

11   <u>Overt Act No. 100:</u>   On February 19, 2024, as defendant PHILLIPS
12   continued to demand payment and audit Victim 8's time, he also told
13   Victim 8 that he had "just slapped the shi[t] out of this bitch," who
14   he identified as "Red."   Victim 8 told him that the things he did
15   were "scary."   Defendant PHILLIPS threatened that those were the
16   consequences for anyone who played games with him.   He then shifted
17   tactics, claiming that he was going to "elavate [sic]" her and that
18   he was only hard on her because he knew she was capable of more.
19   Later that day when Victim 8 said she needed to go to sleep because
20   she couldn't keep her eyes open, defendant PHILLIPS ordered her to go
21   outside and catch more dates.

22   <u>Overt Act No. 101:</u>   On February 23, 2024, Victim 8 saw an
23   Instagram post relating to defendant PHILLIPS beating a woman in a
24   grocery store and told defendant PHILLIPS on Instagram, "This why I
25   say you scare me."   Defendant PHILLIPS attempted to call Victim 8 on
26   Instagram and when she did not immediately answer, defendant
27   PHILLIPS, using coded language on Instagram, threatened to beat her.
28   That night Victim 8 went out and attempted to catch dates and

reported her progress to defendant PHILLIPS.  For the next few days, defendant PHILLIPS continued to demand payment from Victim 8 and that Victim 8 account for all the money she had spent.

Overt Act No. 102:  On February 28, 2024, defendant PHILLIPS received $200 through Cash App from Victim 8 after Victim 8 reported that she had money to send to defendant PHILLIPS.

(f)  Defendant PHILLIPS Sex Trafficked Victim 9 Through Force, Fraud, and Coercion

Overt Act No. 103:  In and around September 2023, through a series of Instagram messages, calls, and an in-person meeting, defendant PHILLIPS recruited Victim 9 to work for him as his sex worker.  Defendant PHILLIPS told her, in coded messages, that he gave her an "interview" even though she did not bring him the required initiation fee.

Overt Act No. 104:  On October 2, 2023, defendant PHILLIPS received from Victim 9 $200 in commercial sex proceeds over two Cash App payments.

Overt Act No. 105:  On October 18, 2023, through coded messages on Instagram, defendant PHILLIPS reprimanded Victim 9 for not taking her commercial sex work seriously and said it was the reason she had gotten "nowhere."

Overt Act No. 106:  On October 27, 2023, defendant PHILLIPS received from Victim 9 $80 in commercial sex proceeds over Cash App.

Overt Act No. 107:  On November 21, 2023, defendant PHILLIPS received from Victim 9 $120 in commercial sex proceeds in two Cash App payments.

Overt Act No. 108:  On December 17, 2023, and throughout the rest of the month, using coded messages on Instagram, defendant

45

PHILLIPS demanded payment, ordered Victim 9 to reveal her location, and warned her to stop playing games.

Overt Act No. 109:  On December 18, 2023, using coded messages on Instagram, defendant PHILLIPS threatened to beat Victim 9 and told her that her options were to pay him or be beaten.  He then demanded to know her location so he could beat her.  When Victim 9 asked defendant PHILLIPS why he was going to beat her, defendant PHILLIPS instructed her to "ask" about his reputation, advising she would learn that he beat his trafficking victims if they were disobedient. Defendant continued to threaten her: "w[h]en I catch u" "Ima knock u out" "where the trap."  Defendant PHILLIPS proceeded to leave Victim 9 a stream of voice memos threatening to track her down and beat her, and warning that she would never be able to work on the Figueroa Corridor again.

Overt Act No. 110:  From the end of December 2023 through approximately January 16, 2024, in coded messages on Instagram, defendant PHILLIPS continued to berate Victim 9, demand payment, and demand to know her location.

Overt Act No. 111:  On February 14, 2023, through coded messages on Instagram, defendant PHILLIPS again demanded payment, but also stated that he had "fired" Victim 9.  Victim 9 asked defendant PHILLIPS if he would consider taking her back.  Defendant PHILLIPS replied that there would be a fee and that Victim 9 would have to be on a "new program."

Overt Act No. 112:  On February 19, 2024, defendant PHILLIPS assaulted Victim 9, stating, in his own words, that he "slapped the shi[t]" out of her.

46

      **4.   2024: Enterprise Members Sex and Drug Trafficked, and Elevated the Hoover Reputation through Violence**

      (a)   Enterprise Members Worked Together to Recruit, Maintain, and Sex Traffic Victims; Held a Gang Meeting; Committed Assaults to Further the Hoover Reputation; and Distributed Drugs

Overt Act No. 113:  On January 5, 2024, defendant ARMSTEAD received a $50 Cash App payment for her sale of promethazine with codeine.

Overt Act No. 114:  On January 17, 2024, using coded language over Instagram, defendant ARMSTEAD purchased a black-market Mega Personals account and had an unidentified co-conspirator post a sex advertisement for defendant ARMSTEAD's sex worker.

Overt Act No. 115:  On January 17, 2024, defendant ARMSTEAD sent an unidentified co-conspirator $80 via Cash App for a black-market Mega Personals account.

Overt Act No. 116:  On January 21, 2024, defendant ARMSTEAD received a $69 Cash App payment from an unindicted co-conspirator on behalf of another unindicted co-conspirator for the sale of promethazine with codeine.

Overt Act No. 117:  On January 25, 2024, using coded language on Instagram, defendant BROOKS asked defendant ARMSTEAD for a place to stay where he could "duck low for a few months."

Overt Act No. 118:  On January 27, 2024, using coded messages on Instagram, an unindicted co-conspirator complained to defendant EVANS that Hoovers were hanging out without any guns and thus making the gang look weak.  Defendant EVANS replied that they should start having a gang meeting every week.

Overt Act No. 119:  On January 27, 2024, using coded messages on Instagram, defendant ARMSTEAD recruited a sex worker and enticed her

to go to Las Vegas with defendant ARMSTEAD and an unindicted co-conspirator to engage in commercial sex work.

Overt Act No. 120:  On February 2, 2024, defendant ARMSTEAD, using coded messages on Instagram, demanded a $1,500 "choosing fee" from a potential sex worker who told defendant ARMSTEAD she was "ready to come home," meaning ready to work for defendant ARMSTEAD.

Overt Act No. 121:  On February 8, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell an unidentified drug customer promethazine with codeine for $200 a pint or $25 a line, referring to the dosage line on the bottle cap.

Overt Act No. 122:  On February 15, 2024, defendant AMOAKO and five other known Hoover gang members were found at defendant ARMSTEAD's residence at 527 West 88th Street, a residence Hoovers Enterprise members used to house sex trafficking victims.  Inside the residence, there were outfits consistent with commercial sex work, a bed, and condoms.  As law enforcement approached the residence, an unidentified person threw a blue-steel, semi-automatic handgun out of a window.

Overt Act No. 123:  On February 17, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant EVANS they were having a gang meeting, which defendant EVANS agreed to attend.

Overt Act No. 124:  On February 17, 2024, using coded language on Instagram, defendant ARMSTEAD informed an unindicted co-conspirator about the Hoover gang meeting to take place in a park in Hoover territory.

Overt Act No. 125:  On February 18, 2024, using coded messages on Instagram, defendant PHILLIPS recruited an unidentified sex worker, told her that he had "elevated [sic]" his "bottom bitch,"

that his other sex workers were "weak," and that his "come home fee is 2000," meaning she had to pay a fee of $2,000 to work for him, to which the unidentified sex worker replied that was "easy" and told defendant PHILLIPS to come to her apartment to pick her up.

Overt Act No. 126:  On February 18, 2024, using coded messages on Instagram, defendant BROOKS asked defendant AMOAKO to provide oxycodone, which defendant AMOAKO agreed to provide to defendant BROOKS at the Stadium Inn.  Defendant BROOKS advised defendant AMOAKO when he arrived at the Stadium Inn, where defendant AMOAKO provided defendant BROOKS with defendant AMOAKO's Cash App name for defendant BROOKS to provide payment.

Overt Act No. 127:  On February 18, 2024, defendant BROOKS sent defendant AMOAKO $20 on Cash App for oxycodone pills.

Overt Act No. 128:  On February 19, 2024, using coded messages on Instagram, defendant ARMSTEAD recruited a sex worker who previously worked for her and told her that she had another sex worker working for her.  Defendant ARMSTEAD enticed her former sex worker to "come home," sent an Uber to pick her up, and told her to go to 222 South Figueroa Street with all of her belongings.  The sex worker told defendant ARMSTEAD that once she arrived, she had an "outcall" date for $300.

Overt Act No. 129:  On February 20, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS where he was and defendant EVANS replied, "Set now," referring to their Hoover territory.  Defendant ARMSTEAD wrote that she was "in the gunnits," referring to the hundreds blocks in Hoover territory.

Overt Act No. 130:  On February 20, 2024, using coded messages on Instagram, an unindicted co-conspirator asked defendant ARMSTEAD

if she wanted to purchase his sex worker for $1,000, noting that if she did not, he would sell her organs across the border.  Defendant ARMSTEAD replied by asking what the sex worker looked like.

Overt Act No. 131:  On February 23, 2024, defendant PHILLIPS posted a video on Instagram, filmed by defendant ROBINSON, showing defendant PHILLIPS approach his sex trafficking victim in a store, pull her to the ground, then repeatedly punch and kick her.  The video is captioned "Chop Season" – a reference to his moniker "Chop Em," and a hashtag reads, "#idontpromoteviolence" with three "laughing" emojis.

Overt Act No. 132:  On February 23, 2024, defendant ARMSTEAD sent defendant EVANS an Instagram video showing defendant PHILLIPS assaulting his sex trafficking victim.  Defendant EVANS replied with five "laughing" emojis and asked, "Waylon?" referring to defendant PHILLIPS (an amalgam of "Jalon" and his moniker "Waymo Paymo," also known as "Chop Em," which is referenced in the caption "Chop Season").  Defendant EVANS replied again with three more "laughing" emojis and added, "If you ever be needing that lmk I got it," offering to assault defendant ARMSTEAD's sex workers.  Defendant ARMSTEAD replied, "HooVa st."

Overt Act No. 133:  On February 23, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell promethazine with codeine and oxycodone to an unidentified customer.

Overt Act No. 134:  On February 24, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell a prospective drug customer promethazine with codeine.  Defendant ARMSTEAD told the customer to meet at 222 South Figueroa.

1    Overt Act No. 135:  On February 25, 2024, using coded language
2   on Instagram, defendant EVANS reprimanded his sex worker, criticizing
3   her for not acting properly, not making enough money for him, and
4   thereby tarnishing his public image.

5    Overt Act No. 136:  On February 27, 2024, using coded language,
6   defendant ARMSTEAD told an unidentified co-conspirator that that she
7   was on Gage Avenue in Hoover territory recruiting commercial sex
8   workers.

9    Overt Act No. 137:  On February 27, 2024, in coded messages on
10  Instagram, defendants AMOAKO and ARMSTEAD discussed their respective
11  sex workers getting in a fight, to which defendant ARMSTEAD wrote
12  that she was "pullin up" and would "get on that bitch."

13   Overt Act No. 138:  On February 28, 2024, using coded language
14  on Instagram, defendants EVANS and AMOAKO discussed their sex
15  workers.  Defendant EVANS told defendant AMOAKO that defendant BROOKS
16  needed defendant EVANS's help because defendant EVANS's sex worker
17  was drunk and acting out of line.

18   Overt Act No. 139:  On February 29, 2024, defendant ARMSTEAD
19  distributed 25 prescription oxycodone pills to an unindicted co-
20  conspirator and agreed to drop off the drugs at the House of Hotties.

21   Overt Act No. 140:  On February 29, 2024, defendant ARMSTEAD
22  received a Cash App payment of $375 from an unidentified person using
23  a Cash App account with account name "House of Hotties."

24   Overt Act No. 141:  On March 1, 2024, defendant ARMSTEAD told an
25  unindicted co-conspirator that she was at the Stadium Inn.

26   Overt Act No. 142:  On March 3, 2024, in coded language on
27  Instagram, defendant ARMSTEAD exchanged messages with a prospective
28  sex worker about doing "dates," and defendant ARMSTEAD told the

prospective sex worker that defendant ARMSTEAD was sending an Uber to pick her up.

Overt Act No. 143:  On March 4, 2024, at approximately, 11:39 a.m., using coded language on Instagram, defendant AMOAKO asked defendant ARMSTEAD to physically assault Victim 5 because she was disobeying defendant AMOAKO's orders.

Overt Act No. 144:  On March 4, 2024, at approximately 11:44 a.m., using coded language on Instagram, defendant ARMSTEAD asked defendant AMOAKO where Victim 5 was and confirmed that defendant ARMSTEAD would physically beat Victim 5 to ensure Victim 5's compliance with defendant AMOAKO's orders.

Overt Act No. 145:  On March 4, 2024, in coded language on Instagram, defendant ARMSTEAD attempted to recruit a sex worker and told her that she had two sex workers but that one left her, stating "Okay you can have me to yourself."

Overt Act No. 146:  On March 5, 2024, defendant ISREL posted to Instagram a photograph of himself holding a semi-automatic pistol with a caption that read, "Get yo sht together u can ball like me too."

Overt Act No. 147:  On March 6, 2024, using coded language on Instagram, Victim 10 asked defendant AMOAKO if he had oxycodone, and defendant AMOAKO responded affirmatively and told her that he was at the Stadium Inn.

Overt Act No. 148:  On March 7, 2024, an unindicted co-conspirator, using coded language, solicited and offered to pay defendant ARMSTEAD and another unindicted co-conspirator to physically assault and rob two sex workers who were refusing to work

for a Hoover pimp, to which defendant ARMSTEAD responded, "Where they be at."

Overt Act No. 149:  On March 10, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS to get a hotel room for her.  Defendant EVANS reported that he tried to get defendant ARMSTEAD a room, but he was rejected because he tried to use a false identification.

Overt Act No. 150:  On March 10, 2024, using coded messages on Instagram, defendant ARMSTEAD's prospective sex worker told defendant ARMSTEAD that she had a friend who could also work for defendant ARMSTEAD, and defendant ARMSTEAD said that she wanted both women to work for her.

Overt Act No. 151:  On March 10 through 12, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant HARRIS to book a hotel room for her and that she would pay him when she arrived.  Defendant HARRIS advised that he had left the hotel but offered to go back.  Defendant HARRIS told defendant ARMSTEAD that he was not able to get her a room, and defendant ARMSTEAD asked to use his rooms for her sex worker.  Defendant HARRIS agreed and told defendant ARMSTEAD he was in Room 12 and the door was open. Defendant ARMSTEAD told defendant HARRIS she might need him to pick up her sex worker, and defendant HARRIS agreed to do so.  Defendant ARMSTEAD advised that her sex worker needed the room for a commercial sex date, and defendant HARRIS replied that his sex worker was on a date in the room.  Defendant ARMSTEAD said that her sex worker would do "car dates" and would only need the room for one or two commercial sex dates, to which defendant HARRIS agreed.

Overt Act No. 152:  On March 16, 2024, using coded language, defendant ISREL told defendant ARMSTEAD that he was getting his gun fixed and then he would be back in their set of Hoover territory.

Overt Act No. 153:  On March 17, 2024, at approximately 11:15 p.m., using coded language on Instagram, defendant ARMSTEAD told defendant AMOAKO that she needed oxycodone.

Overt Act No. 154:  On March 19, 2024, using coded messages on Instagram, an unindicted co-conspirator offered to sell defendant ARMSTEAD 100 oxycodone pills for $9 per pill, for further distribution.

Overt Act No. 155:  On March 19, 2024, defendant ROBINSON sent an audio message to defendant ARMSTEAD, saying, in coded language, that an unknown male, who was "not from the set," is going to be brought to "the set" and would be robbed again.

Overt Act No. 156:  On March 20, 2024, using coded language on Instagram, defendant ARMSTEAD warned an unidentified co-conspirator not to return to "the spot" because it was under investigation and people would go to jail, including defendant ARMSTEAD, adding, "so tell everybody don't go back right there."

Overt Act No. 157:  On March 21, 2024, using coded language on Instagram, defendant HARRIS told defendant YOUNG that defendant HARRIS was on his way back to the Figueroa Corridor with defendant ARMSTEAD and that defendants HARRIS and YOUNG would recruit new sex workers that night.

Overt Act No. 158:  On March 23, 2024, using coded messages on Instagram, defendant ARMSTEAD bragged to defendant AMOAKO that a sex worker who defendant ARMSTEAD wanted to see assaulted was about to get assaulted without defendant ARMSTEAD having to lay a hand on her.

Overt Act No. 159:  On March 23, 2024, defendant ROBINSON sent an audio message to defendant ARMSTEAD, saying that he pimps and panders minors that are over 16 years old and under 18 years old.

Overt Act No. 160:  On March 23, 2024, using coded language on Instagram, defendant EVANS instructed defendant HARRIS to allow him to use defendant HARRIS's car while defendant EVANS's sex worker completed a commercial sex date.

Overt Act No. 161:  On March 23, 2024, an unidentified third party sent defendant ARMSTEAD a video, posted on Instagram, in which defendant ARMSTEAD and others are seen kicking and punching a woman on the ground while she screams for help.  Defendant ARMSTEAD confirmed that she was the assailant in the video and explained that the victim had beat up one of her sex workers.

Overt Act No. 162:  On March 24, 2024, using coded messages on Instagram, defendant ARMSTEAD told an unidentified drug customer that defendant ARMSTEAD was at the Stadium Inn.  The unidentified customer asked defendant ARMSTEAD if she had oxycodone for sale.

Overt Act No. 163:  On March 24, 2024, using coded language on Instagram, defendant CROCKHAM asked defendant ARMSTEAD for oxycodone.

Overt Act No. 164:  On March 24, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant AMOAKO for oxycodone, to which defendant AMOAKO responded that he was approaching her location with an unindicted co-conspirator.

Overt Act No. 165:  On March 29, 2024, defendant ARMSTEAD received from an unidentified customer $150 on Cash App for the sale of promethazine with codeine.

Overt Act No. 166:  On March 27, 2024, using coded language on Instagram, defendant EVANS advised defendant ARMSTEAD that he and

defendant AMOAKO were on their way to sell oxycodone "in the grapes," referring to Grape Street gang territory.

Overt Act No. 167:  On March 27, 2024, using coded language in Instagram messages, defendant ROBINSON told defendant ARMSTEAD he was waiting for a sex worker to finish a sex act.

Overt Act No. 168:  On March 30, 2024, using coded messages on Instagram, defendant ARMSTEAD arranged to sell and deliver oxycodone pills for $20 per pill to an unidentified drug customer.

Overt Act No. 169:  On April 1, 2024, in coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD about a sex worker who contacted defendant EVANS on Instagram.  Defendant ARMSTEAD confirmed that she had seen the sex worker before and that she was not an undercover police officer.

Overt Act No. 170:  On April 3, 2024, defendant ARMSTEAD, using coded language on Instagram, asked defendant AMOAKO to call an Uber for her sex worker and promised to give him "the hoovz," meaning pay him back.

Overt Act No. 171:  On April 4, 2024, using coded language on Instagram, defendant ARMSTEAD recruited a sex worker, but the sex worker stated she was "nervous" because defendant ARMSTEAD was beating up several sex workers.  The unidentified sex worker reported to defendant ARMSTEAD that she had a "house call" date for $600.

Overt Act No. 172:  On April 6, 2024, using coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD if she still had a gun.  The next day, defendant EVANS asked defendant ARMSTEAD if she was in the hotel room and she responded affirmatively.  Defendant EVANS replied that he was going to go to the hotel and get the gun,

and defendant ARMSTEAD responded that it was in room 17 in a drawer and that the door was open.

Overt Act No. 173:  On April 6, 2024, in coded messages on Instagram, defendant ARMSTEAD and an unidentified person messaged about defendant ARMSTEAD selling oxycodone.

Overt Act No. 174:  On April 6, 2024, using coded messages on Instagram, an unindicted co-conspirator asked defendant ARMSTEAD for oxycodone.

Overt Act No. 175:  On April 7, 2024, defendants ARMSTEAD, EVANS, HARRIS, and BROOKS were together at the parking lot of the Stadium Inn, with defendant BROOKS in possession of oxycodone, and defendant HARRIS in possession of promethazine in the center console of defendant HARRIS's car.

Overt Act No. 176:  On April 9, 2024, using coded language in a series of Instagram messages, an unindicted co-conspirator told defendant ARMSTEAD she left promethazine with codeine in defendant HARRIS's car and that he was stashing it for her.

Overt Act No. 177:  On April 13, 2024, using coded language on Instagram, as part of a recruitment tactic, defendant YOUNG told Victim 10 that he was going to visit her on the Figueroa Corridor, to which Victim 10 told defendant YOUNG that she was already being pimped by defendant BROOKS.

Overt Act No. 178:  On April 13, 2024, defendant ARMSTEAD sent defendant EVANS an Instagram profile for "theeladyjayy," and defendant EVANS, using coded language, replied that she looked like his sex worker and that he wanted her to work for him.  Defendant ARMSTEAD encouraged defendant EVANS to recruit her, writing, "She

would look good in yo stable," referring to defendant EVANS's collection of sex workers.

Overt Act No. 179:  On April 14, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS to send an Uber for one of defendant ARMSTEAD's sex workers.  Defendant EVANS asked defendant ARMSTEAD if the sex worker arrived, and defendant ARMSTEAD replied that she missed the car.  Defendant EVANS offered to send another Uber car.

Overt Act No. 180:  On April 14, 2024, in coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD if she had any oxycodone to sell to another pimp who also rented a room at the hotel.  Defendant ARMSTEAD confirmed that she did and went to the hotel to meet the customer.  Defendant EVANS asked defendant ARMSTEAD to send her $40 and she confirmed she would.  Defendant ARMSTEAD asked where the customer was, and defendant EVANS said he stepped away but that his room was near defendant HARRIS's room.  Defendant ARMSTEAD advised that she would come back to the hotel later, and defendant EVANS said he would contact her as soon as the police left the hotel.  Defendant EVANS informed defendant ARMSTEAD when the police left and defendant ARMSTEAD returned to the hotel to sell the oxycodone.

Overt Act No. 181:  On April 15, 2024, defendant ARMSTEAD knocked on a hotel room door and told defendant EVANS, using coded messages on Instagram, that she was going to put a gun in the room.

Overt Act No. 182:  On April 16, 2024, using coded language, defendant ARMSTEAD told an unidentified third party that she was selling drugs in defendant EVANS's room at a hotel.

Overt Act No. 183:  Between April 16 and 17, 2024, defendants ARMSTEAD and EVANS, using coded messages on Instagram, discussed selling oxycodone out of their shared hotel room.

Overt Act No. 184:  On April 18, 2024, using coded language on Instagram, defendant ARMSTEAD recruited an unidentified woman as a sex worker and demanded $1,000 by the end of her first night.

Overt Act No. 185:  On April 18, 2024, using coded Instagram messages, defendant ARMSTEAD identified a person in a photograph as a law enforcement cooperator, adding, "HooVa want his head!!"

Overt Act No. 186:  On April 20, 2024, using coded messages on Instagram, defendant ARMSTEAD directed an unindicted co-conspirator to loan his car to defendant ARMSTEAD so that she could run someone over with it.

Overt Act No. 187:  On April 20, 2024, using coded messages on Instagram, defendant HARRIS asked defendant YOUNG to book him a hotel room where his sex workers could engage in commercial sex.

Overt Act No. 188:  On April 23, 2024, using coded messages on Instagram, defendant HARRIS asked defendant ARMSTEAD for oxycodone and a car ride.

Overt Act No. 189:  On April 24, 2024, through coded messages on Instagram, defendant ARMSTEAD recruited an unidentified sex worker by offering her drugs and fine dining experiences.  The unidentified sex worker told defendant ARMSTEAD that she was scared of her because defendant ARMSTEAD assaulted people.  Defendant ARMSTEAD claimed that she did not beat her sex workers, claiming that one of the people she beat had stolen $3,500 that defendant ARMSTEAD was owed from a bank scam.

1      <u>Overt Act No. 190:</u>  On April 25, 2024, through Instagram

2  messages, defendant ARMSTEAD told an unidentified third party that

3  she was at the Stadium Inn.

4           (b)  <u>Defendant ARMSTEAD Sex Trafficked Victim 11, a then-</u>
                <u>14-Year-Old Girl, While Drug Trafficking with</u>

5                <u>Defendant EVANS</u>

6

7      <u>Overt Act No. 191:</u>  On April 26, 2024, through at least April

8  29, 2024, defendants ARMSTEAD and EVANS utilized hotel rooms at the

    Stadium Inn for their sex workers, including Victim 11, a 14-year-old

9  girl, to use for commercial sex dates with "Johns."

10      <u>Overt Act No. 192:</u>  On April 26 and 27, 2024, using coded

11  messages on Instagram, defendant EVANS advised defendant ARMSTEAD he

12  was at the hotel room they were sharing.

13      <u>Overt Act No. 193:</u>  On April 27, 2024, using coded messages on

14  Instagram, defendant EVANS asked defendant ARMSTEAD to take him to

15  the "10" because "DD" owed him $1,000.  Defendant ARMSTEAD replied

16  that she was on her way.

17      <u>Overt Act No. 194:</u>  On April 28, 2024, at approximately 7:39

18  a.m., defendant CROCKHAM flashed a Hoover gang sign in the parking

19  lot of the Stadium Inn.

20      <u>Overt Act No. 195:</u>  On April 28, 2024, defendant ARMSTEAD took

21  Victim 11 to the House of Hotties in order to purchase clothing for

22  commercial sex work.

23      <u>Overt Act No. 196:</u>  On April 28, 2024, defendant ARMSTEAD took

24  Victim 11 to a store called "Sluts" located at 7612 S Figueroa Street

25  in Los Angeles, in order to purchase clothing for commercial sex

26  work.

27

28

Overt Act No. 197:  On April 28, 2024, defendant ARMSTEAD gave Victim 11 instructions about how to engage in commercial sex work, including telling Victim 11 not to talk to Black men and not talk to other commercial sex workers.

Overt Act No. 198:  On April 28, 2024, while defendant ARMSTEAD was sex trafficking Victim 11, defendant EVANS paid for and picked up food for defendant ARMSTEAD, for which defendant ARMSTEAD told defendant EVANS she would reimburse.

Overt Act No. 199:  On April 28, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant EVANS to instruct his sex worker to take oxycodone out of the hotel room after she finished her commercial sex date.  Defendant ARMSTEAD then asked defendant EVANS to take five oxycodone pills to the person in the BMW that was parked in front of the hotel room at Stadium Inn, which defendant EVANS agreed to do.  Defendant ARMSTEAD advised that the customer sent $60 to defendant ARMSTEAD and would give defendant EVANS an additional $40.  Hours later, defendant ARMSTEAD told defendant EVANS that she needed all the remaining oxycodone and asked him to bring her all of it.

Overt Act No. 200:  On April 29, 2024, defendant ARMSTEAD gave Victim 11 a narcotic pill while Victim 11 was engaging in commercial sex acts, which resulted in Victim 11 being under the influence.

Overt Act No. 201:  On April 29, 2024, at approximately 1:01 a.m., defendant ARMSTEAD received a notification from Victim 11 over Instagram messages that Victim 11 did not have condoms.

Overt Act No. 202:  On April 29, 2024, at approximately 1:52 a.m., defendant ARMSTEAD received an Instagram message from Victim 11

informing defendant ARMSTEAD that Victim 11 was leaving the Stadium Inn.

Overt Act No. 203:  On April 29, 2024, at approximately 2:15 a.m., defendant ARMSTEAD sent an Instagram message to Victim 11 asking how much money Victim 11 made from commercial sex work, to which Victim 11 responded that she made $85 but only had $80 because she spent $5 on condoms.

Overt Act No. 204:  On April 29, 2024, at approximately 2:58 a.m., defendant ARMSTEAD received Instagram messages from Victim 11 saying Victim 11 needed more condoms.

Overt Act No. 205:  On April 29, 2024, at approximately 3:44 a.m., defendant ARMSTEAD received an Instagram message from Victim 11 informing defendant ARMSTEAD that Victim 11 was leaving the Stadium Inn.

Overt Act No. 206:  On April 29, 2024, at approximately 4:36 a.m., defendant ARMSTEAD sent an Instagram message to Victim 11, directing her to get five more commercial sex dates.

Overt Act No. 207:  On April 29, 2024, at approximately 8:05 p.m., Victim 11 sent Instagram messages to defendant ARMSTEAD, saying she forgot condoms again to which defendant ARMSTEAD directed Victim 11 to have somebody else buy them.

Overt Act No. 208:  On April 29, 2024, at approximately 10:22 p.m., defendant ARMSTEAD sent an Instagram message to Victim 11, asking where she was, to which Victim 11 stated she was in a car "doing a blow job."  Defendant ARMSTEAD asked if Victim 11 closed the door.  Victim 11 said she thought she did close the door, to which defendant ARMSTEAD responded, "Don't close door."

1    Overt Act No. 209:   On April 29, 2024, defendant ARMSTEAD
2    received three separate Cash App payments from Victim 11, totaling
3    $184.94.
4        Overt Act No. 210:   On April 29, 2024, using coded messages on
5    Instagram, defendant EVANS told defendant ARMSTEAD that he "fired"
6    his sex worker and asked defendant ARMSTEAD to get her gun and
7    oxycodone, and defendant EVANS's gun, out of their hotel room.
8    Defendant EVANS told defendant ARMSTEAD that he had $80 of hers.
9    Defendant ARMSTEAD agreed to get defendant EVANS's gun and put it in
10   another room she was renting.
11       Overt Act No. 211:   On April 30, 2024, at approximately 2:46
12   a.m., defendant ARMSTEAD sent an Instagram message to Victim 11
13   asking how much money she made.  Victim 11 responded at approximately
14   2:53 a.m., saying she made $152 but would stay out working until she
15   made $500.  Later, at approximately 3:03 a.m., defendant ARMSTEAD
16   received a request from Victim 11 asking defendant ARMSTEAD to bring
17   her pepper spray and a knife.
18       Overt Act No. 212:   On April 30, 2024, at approximately 4:00
19   p.m., defendant ARMSTEAD received Instagram messages from Victim 11
20   saying that Victim 11 had $2,000 for defendant ARMSTEAD.
21       Overt Act No. 213:   On April 30, 2024, defendant ARMSTEAD
22   informed defendant GRAY that she was renting Room 15 at the Stadium
23   Inn.
24       Overt Act No. 214:   On April 30, 2024, defendant GRAY informed
25   defendant ARMSTEAD that he was renting Room 21 at the Stadium Inn.
26       Overt Act No. 215:   On April 29, 2024, defendant ARMSTEAD
27   offered to sell oxycodone to a suspected sex worker and said she was
28   at the Stadium Inn.

<u>Overt Act No. 216:</u>  On May 1, 2024, using coded messages on Instagram, defendant ARMSTEAD and an unindicted co-conspirator discussed defendant ARMSTEAD's sex trafficking of Victim 11. Defendant ARMSTEAD stated that the trafficking made defendant ARMSTEAD look like a "child predator," after Victim 11's family picked Victim 11 up in the parking lot of the Stadium Inn.  The unindicted co-conspirator informed defendant ARMSTEAD that he was contacted by Victim 11's family.

(c)  <u>Defendant YOUNG Sex Trafficked Victim 12, a then-17-Year-Old Girl, Through Force, Fraud, and Coercion</u>

<u>Overt Act No. 217:</u>  In June 2024, defendant YOUNG sex trafficked Victim 12, who was a 17-year-old girl at the time.

<u>Overt Act No. 218:</u>  Between June 18, 2024, until at least June 27, 2024, using coded text messages, defendant YOUNG received reports from Victim 12 of her movements, informing defendant YOUNG whether a commercial sex date would occur in a motel room or in the John's car.

<u>Overt Act No. 219:</u>  On June 19, 2024, using coded text messages, defendant YOUNG told Victim 12 that the motel room was available for her to engage in a commercial sex date, and instructed her to inform him when the John left the room.

<u>Overt Act No. 220:</u>  On or before June 19, 2024, defendant YOUNG physically assaulted Victim 12.

<u>Overt Act No. 221:</u>  On June 23, 2024, using coded text messages, defendant YOUNG directed Victim 12 to have a John send payment to defendant YOUNG's Cash App account.  When the payment did not work, defendant YOUNG directed Victim 12 to take the John to an ATM.

1      <u>Overt Act No. 222:</u>  On June 25, 2024, using coded text messages,

2   defendant YOUNG told Victim 12 that he publicly beat her because she

3   disrespected him in front of other people.

4          (d)  <u>Defendant YOUNG Sex Trafficked Victim 13 Through
            Force, Fraud, and Coercion</u>

5

6      <u>Overt Act No. 223:</u>  On June 28, 2024, through coded messages on

    Instagram, defendant YOUNG's sex trafficking victim, Victim 13,

7   reported details of her commercial sex date to defendant YOUNG and

8   advised that she sent the proceeds of this date to defendant YOUNG

9   via Cash App.

10     <u>Overt Act No. 224:</u>  On June 29, 2024, through coded messages on

11  Instagram, defendant YOUNG instructed Victim 13 to keep the hotel

12  room door open when she used the room for a commercial sex date.

13     <u>Overt Act No. 225:</u>  On June 29, 2024, using coded messages on

14  Instagram, defendant YOUNG required Victim 13 to remit her earnings

15  from commercial sex to him, and they discussed which money

16  application to use to transmit her earnings.

17     <u>Overt Act No. 226:</u>  On June 29, 2024, using coded messages on

18  Instagram, defendant YOUNG instructed Victim 13 about how to arrange

19  dates with commercial sex buyers and the language to use for these

20  communications.  Victim 13 reported to defendant YOUNG that she had a

21  date with two Johns and would receive $100 per John.

22     <u>Overt Act No. 227:</u>  On June 29, 2024, using coded messages on

23  Instagram, defendant YOUNG directed Victim 13 to tell Johns to use

24  certain payment platforms, in order for defendant YOUNG to be paid

25  directly, after Victim 13 had engaged in commercial sex acts.

26  Defendant YOUNG confirmed he received a $200 payment.

27

28

1    <u>Overt Act No. 228:</u>  On June 30, 2024, defendant YOUNG received

2    reports from Victim 13, through coded messages on Instagram, that she

3    received $220 for a commercial sex date and that defendant YOUNG

4    would receive her earnings via Cash App.

5    <u>Overt Act No. 229:</u>  On June 30, 2024, defendant YOUNG informed

6    Victim 13, through coded language on Instagram, that he would bring

7    condoms to her motel room for a commercial sex date.

8    <u>Overt Act No. 230:</u>  Throughout late June and early July 2024,

9    defendant YOUNG received reports from Victim 13 about her commercial

10    sex dates and confirming that she would remit her proceeds to him via

11    Cash App or have Johns send payments to defendant YOUNG directly via

12    Apple Pay.

13    <u>Overt Act No. 231:</u>  On July 9, 2024, defendant YOUNG received a

14    report from Victim 13, through coded language on Instagram, that

15    Victim 13 received $300 from a John who is a "regular."

16    <u>Overt Act No. 232:</u>  On July 12, 2024, defendant YOUNG

17    manipulated and controlled Victim 13 by pitting her against his new

18    sex worker, telling Victim 13 that the new sex worker could earn

19    $2,500 from commercial sex because she was obedient, unlike Victim 13

20    To further demean Victim 13, he told Victim 13 that he robbed some of

21    the Johns that Victim 13 worked with and made $2,500, implying that

22    he had to intervene because she was not making enough on her own.

23    <u>Overt Act No. 233:</u>  On July 12, 2024, through coded messages on

24    Instagram, Victim 13 confronted defendant YOUNG about pimping minors.

25    Defendant YOUNG did not deny pimping minors, and instead taunted

26    Victim 13, noting that he made $2,500 from Victim 12's sex work.

27    Defendant YOUNG repeatedly told Victim 13 that she was worthless and

28    could not make nearly as much as his other sex workers, including

Victim 12.  He further taunted her, asserting that Victim 12 made him

enough money to get "multiple cars," and instructed Victim 13, "Keep

up bitch."  He wrote that she was "pressured up" to make more money

because defendant YOUNG impregnated Victim 12 and thus Victim 12

would eventually need to take leave from commercial sex work.

Overt Act No. 234:  On July 12, 2024, defendant YOUNG sent

Victim 13 an audio message on Instagram, threatening, "You ain't

gonna touch nothing but death bitch.  Somebody going to kill you

bitch.  A trick, a pimp, somebody bitch, ME!  Dead homies."

Overt Act No. 235:  On July 12, 2024, defendant YOUNG sent

Victim 13 an audio message on Instagram, threatening "Don't ever let

me see you down bitch, nigga going to knock you the fuck out bitch.

Like I slapped your dumb ass head into the wall bitch."

(e)  Defendant YOUNG Sex Trafficked Victim 14, a then-15-
Year-Old Girl, and Produced Child Sexual Abuse
Material of Her

Overt Act No. 236:  Beginning on July 6, 2024, defendant YOUNG

sex trafficked Victim 14, a then 15-year-old girl, out of the Stadium

Inn.

Overt Act No. 237:  On July 9, 2024, while at the Stadium Inn,

defendant YOUNG produced child sexual abuse material of Victim 14,

which included a video from defendant YOUNG's point of view while he

held the camera and showed Victim 14 performing oral copulation on

defendant YOUNG.

Overt Act No. 238:  On July 9, 2024, while at the Stadium Inn,

defendant YOUNG produced child sexual abuse material of Victim 14,

which included a video of defendant YOUNG having vaginal intercourse

with Victim 14 in a shower.

Overt Act No. 239:  On July 12, 2024, using coded messages on Instagram, defendant YOUNG told Victim 10 that Victim 14 was his only loyal sex worker.

Overt Act No. 240:  On July 18, 2024, defendant YOUNG produced child sexual abuse material of Victim 14, which included a video from defendant YOUNG's point of view while he held the camera and showed Victim 14 performing oral copulation on defendant YOUNG.

Overt Act No. 241:  On July 27, 2024, until at least July 29, 2024, defendant YOUNG facilitated the posting of commercial sex advertisements for Victim 14.

(f)  Defendant HARRIS Sex Trafficked Victim 15, a then-17-Year-Old Girl

Overt Act No. 242:  On an unknown date, but before July 8, 2024, Victim 15 was branded with a tattoo of defendant HARRIS's first name on her buttocks.  She was also branded with a tattoo, on her face, of the first letter of defendant HARRIS's name, "N," and a crown, which represented that defendant HARRIS was her pimp.

Overt Act No. 243:  On July 8, 2024, defendant HARRIS and his sex trafficking victim, Victim 15, who was a 17-year-old girl at the time, appeared in a video filmed in a hotel room.  In the video, Victim 15 was laying on a bed and defendant HARRIS had a stack of money in his hand.  Victim 15 states she has $370 and needs four more commercial sex dates to get where she needs to go.  Defendant HARRIS rhetorically asks where she needs to go and Victim 15 states to get a "band," referring to making $1,000.  Defendant HARRIS belittles her, asking, if she is "a thousand-dollar bitch."  In the video, Victim 15 is dressed in a see-through fish-net style dress that shows her buttocks.

1    Overt Act No. 244:  On July 8, 2024, using coded language in

2    text messages, Victim 15 asked defendant HARRIS if she could stop sex

3    work for the night, and defendant HARRIS denied her request.

4              (g)   Defendant HARRIS Continued to Sex Traffic Victim 15 as
                     an Adult through Violence and Threats of Violence;
5                    Defendant YOUNG Attempted to Recruit Victim 15

6    Overt Act No. 245:  On November 24, 2024, using coded language

7    in text messages, Victim 15, who had since become an adult, reported

8    to defendant HARRIS that she needed more condoms for commercial sex

9    dates, to which defendant HARRIS replied he needed money.  Victim 15

10   directed defendant HARRIS to her Cash App account.

11   Overt Act No. 246:   On November 28, 2024, using coded language

12   in text messages, Victim 15 reported to defendant HARRIS that she was

13   at the House of Hotties and needed more condoms for commercial sex

14   dates.  Defendant HARRIS advised Victim 15 of his location while she

15   was engaging in dates.

16   Overt Act No. 247:  On November 30, 2024, using coded language

17   in text messages, Victim 15 begged defendant HARRIS for permission to

18   stop working and to go inside out of the cold, noting that other

19   pimps were allowing their sex workers to go inside due to the

20   weather.  Defendant HARRIS denied her request.  Victim 15 continued

21   to plead, telling him, "my feet hurt Naziz, real bad."  Eventually,

22   defendant HARRIS permitted her to stop working and take shelter.

23   Overt Act No. 248:  On December 3, 2024, using coded text

24   messages, Victim 15 told defendant HARRIS that her head hurt.

25   Ignoring that, defendant HARRIS replied that he got more condoms for

26   her commercial sex dates.  Victim 15 again told defendant HARRIS her

27   head hurt, and he asked if she needed to go to the hospital.  Victim

28   15 indicated that she could not go to the hospital because she would

not be able to explain the bruises on her face, and continued to work despite her pain.

Overt Act No. 249:  On December 7, 2024, using coded language in text messages, defendant HARRIS threatened to slap Victim 15 if she persisted to be clingy and ordered her not to turn off the location monitoring feature on her phone that allowed defendant HARRIS to track her.

Overt Act No. 250:  On December 8, 2024, using coded language in text messages, defendant HARRIS told Victim 15 about a new sex worker he started pimping.

Overt Act No. 251:  On December 12, 2024, using coded language in text messages, defendant HARRIS instructed Victim 15 to inform him if she secured a commercial sex date.

Overt Act No. 252:  On December 22, 2024, using coded language in text messages, defendant YOUNG texted Victim 15 in an attempt to recruit her.  Victim 15 told defendant YOUNG that defendant HARRIS trafficked minors and that defendant HARRIS was trafficking a young woman who was pregnant with defendant YOUNG's child.  During the conversation, using coded language, defendant YOUNG stated he bought $700 worth of promethazine with codeine.

> (h)  Enterprise Members Committed Assaults to Advance the Hoover Reputation, Acquired and Stored Guns, Recruited and Sex Trafficked, and Distributed Drugs

Overt Act No. 253:  On May 3, 2024, in coded language on Instagram, defendant ARMSTEAD told a third party that defendant ARMSTEAD "beat [the fuck] outta" an unidentified person, and added, "like read bad."

Overt Act No. 254:  On May 4 and 5, 2024, using coded language in Instagram messages, defendants ISREL and ARMSTEAD discussed

oxycodone, and defendant ISREL left an audio message regarding buying drugs from defendant ARMSTEAD and another person.

Overt Act No. 255:  On May 5, 2024, defendant ISREL sent an audio message to defendant ARMSTEAD, using coded language, explaining that his sex trafficking victim was informing others that defendant ISREL "pistol-whipped her."

Overt Act No. 256:  On May 8, 2024, in a car in the parking lot of the Stadium Inn, defendant ARMSTEAD possessed oxycodone with the intent to distribute it.

Overt Act No. 257:  On May 12, 2024, in coded messages on Instagram, defendant EVANS advised defendant CROCKHAM to move his new sex workers around frequently because it makes them "dependent on you," reducing the chance of them being able to leave.

Overt Act No. 258:  On May 13, 2024, using coded language on Instagram, defendant EVANS attempted to recruit an unidentified victim to be his sex worker, fraudulently claiming he specialized in "upgrading lives and investing money," that he had "been doing this shit so long it's kinda different" for him because he "already got rich out the game" and now he just "elevate[s] girls and put[s] them in position . . . car bank act credit apartment surgeries traveling etc."

Overt Act No. 259:  On May 14, 2024, using coded messages on Instagram, defendant EVANS directed his sex worker to attempt to steal watches and to try to get regular sex customers, boasting that he has mastered trafficking sex workers on the blade, on the internet, and across state lines.

Overt Act No. 260:  On May 16, 2024, to recruit sex workers by curating an image of a lavish lifestyle, defendant AMOAKO posted on

Instagram a photograph of himself in the U.S. Virgin Islands donning a fancy watch, including a caption on the photograph that read, "Take You Out The Country To Island . . . Lets Explore I Wonder If $he Want . . . ."

Overt Act No. 261:  On May 20, 2024, using coded language on Instagram, defendants HARRIS and EVANS discussed the sale of drugs.

Overt Act No. 262:  On May 23, 2023, and again on July 9, 2024, using coded messages on Instagram, defendant ARMSTEAD agreed to sell oxycodone to an unidentified pimp.

Overt Act No. 263:  On May 24, 2024, using coded messages on Instagram, defendant EVANS told defendant ARMSTEAD that he was checking out of their room and that he had her gun.  Defendant ARMSTEAD asked defendant EVANS to get the gun to a trustworthy Hoover member at the hotel and defendant EVANS indicated it would be with defendant CROCKHAM in hotel room number 7.  On May 30, 2024, using coded language, defendant ARMSTEAD told defendant EVANS to get her gun from defendant CROCKHAM.

Overt Act No. 264:  On May 24, 2024, using coded language on Instagram, defendant EVANS told defendant HARRIS that he wanted defendant HARRIS to hold onto defendant ARMSTEAD's gun for safekeeping, but that it was now with defendant CROCKHAM.

Overt Act No. 265:  On May 25, 2024, using coded language on Instagram, defendant ARMSTEAD agreed to pick up defendant PHILLIPS from defendant GRAY's house.

Overt Act No. 266:  On May 26, 2024, defendant ARMSTEAD sent an unidentified co-conspirator a video she filmed showing at least four persons beating to the ground a man who shoplifted from House of Hotties.  On the video, defendant ARMSTEAD screamed at the

shoplifter, "Get the fuck out . . . Don't steal shit in the set . . .
On Hoover . . . What groove out."

Overt Act No. 267:  On May 26, 2024, to curate an image of
himself as a wealthy and powerful pimp, defendant AMOAKO posted a
story on Instagram including a photograph of him wearing an expensive
watch, with bundles of cash and a firearm at his feet.

Overt Act No. 268:  On May 27, 2024, using coded messages on
Instagram, defendant ARMSTEAD sent a video of law enforcement
activity to defendant HARRIS and advised him to "laylow" because he
was "hot," indicating that he was engaged in criminal activity that
could be detected by police.  Defendant HARRIS replied, in coded
messages, that he had left the area with his gun to avoid police
detention.  Defendant ARMSTEAD again said defendant HARRIS was "hot,"
and defendant HARRIS replied that police were "grabbing bitches off
fig."  Defendant ARMSTEAD replied, "They looking for minors."

Overt Act No. 269:  On June 3, 2024, using coded language on
Instagram, defendant ARMSTEAD told defendant EVANS to get her gun
from defendant CROCKHAM and put it in defendant EVANS's hotel room.
Defendant EVANS told her he would bring it to hotel room number 17.

Overt Act No. 270:  On June 4, 2024, using coded language on
Instagram, defendant ARMSTEAD told one of her sex workers, who she
perceived as disrespecting her, "If I SEE IM SMASHING U," "bitch I'm
beating yo ass . . . And your gonna see," and "Bitch ima kill u."  On
June 17, 2024, in coded messages over Instagram, defendant ARMSTEAD
threatened to rob the sex worker and her new pimp.  On July 2, 2024,
defendant ARMSTEAD threatened the sex worker again, writing, "Drunccc
ass bitch be careful outside the opps getting popped," meaning that

sex workers working for rival gang members are getting assaulted or shot.

Overt Act No. 271:  On June 11, 2024, defendant HARRIS, using coded language, asked defendant ARMSTEAD to send him $40 so he could send his sex worker an Uber ride.

Overt Act No. 272:  On June 15, 2024, using coded language on Instagram messages, defendant ARMSTEAD told defendant ROBINSON that she "got the bitch snow she jus ran up the choosing fee," indicating that a sex trafficking victim would have to pay an increased fee to work for defendant ARMSTEAD.

Overt Act No. 273:  On June 16, 2024, using coded language on Instagram, defendant BROOKS told defendant AMOAKO that defendant BROOKS had reacquired his main sex worker the previous night, to which defendant AMOAKO replied that it was all a part of "the Game."

Overt Act No. 274:  On June 25, 2024, using coded language on Instagram, defendant EVANS told defendant ARMSTEAD that he had to take his sex worker to get food.

Overt Act No. 275:  On June 26, 2024, using coded messages on Instagram, defendant EVANS and defendant HARRIS discussed their sex workers.  Defendant HARRIS told defendant EVANS he no longer had a Mexican sex worker, and that his Black sex worker did not make the same amount of money.

Overt Act No. 276:  On July 2, 2024, using coded messages on Instagram, defendant EVANS instructed defendant HARRIS to allow him to use defendant HARRIS's car while defendant EVANS's sex worker completed a commercial sex date.  Defendant EVANS told defendant HARRIS that he needed to stay close to the commercial sex date in

case the sex buyers did anything to his sex worker, explaining that his sex worker was servicing two Johns.

Overt Act No. 277:  On July 2, 2024, using coded language on Instagram, defendant HARRIS told defendant EVANS that he was going to drop his sex worker off on the Figueroa Corridor.

Overt Act No. 278:  On July 4, 2024, using coded language on Instagram, defendant YOUNG attempted to recruit Victim 10 to be a sex worker for him, promising to buy her a phone.

Overt Act No. 279:  On July 4, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he was going to pick her up along with two other sex workers he recruited that "chose up" with him, that is, agreed to be his sex workers.

Overt Act No. 280:  On July 5, 2024, in coded messages on Instagram, defendant ROBINSON asked to purchase promethazine with codeine from defendant ARMSTEAD, and they arranged a meeting place to complete the transaction.

Overt Act No. 281:  On July 5, 2024, defendant ROBINSON sent defendant ARMSTEAD screenshots of coded text messages between defendant ROBINSON and an unknown sex worker in which the sex worker asked defendant ROBINSON to leave her alone since he had new sex workers.  In the messages with the sex worker, defendant ROBINSON threatened that he and another person would physically assault the sex worker.

Overt Act No. 282:  On July 8, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he was going to instruct her on how to conduct herself as his sex worker, once she recovered from an injury.

1    <u>Overt Act No. 283:</u>  On July 9, 2024, defendant YOUNG received a

2    request from Victim 10, using coded language on Instagram, that

3    Victim 10 needed an outfit from House of Hotties.

4    <u>Overt Act No. 284:</u>  On July 13, 2024, in coded Instagram

5    messages, defendant EVANS recruited a prospective sex worker by

6    telling her that if she paid him and represented him "properly," she

7    and her kids could have "anything," and that his fee to work for him

8    was $5,000.

9    <u>Overt Act No. 285:</u>  On July 16, 2024, defendant AMOAKO, using

10   coded language, told defendant ARMSTEAD that he needed his sex

11   trafficking victim, Victim 5, physically assaulted to ensure her

12   compliance.

13   <u>Overt Act No. 286:</u>  On July 16, 2024, defendant ARMSTEAD, using

14   coded language, agreed to physically assault defendant AMOAKO's sex

15   trafficking victim, Victim 5, to discipline her and gain her

16   compliance.

17   <u>Overt Act No. 287:</u>  On July 17, 2024, defendant ARMSTEAD, using

18   messages on Instagram, told an unindicted co-conspirator that

19   defendant AMOAKO offered defendant ARMSTEAD and the unindicted co-

20   conspirator $1,500 to physically assault his sex worker Victim 5 and

21   that the sex worker was currently on Figueroa Street.  The unindicted

22   co-conspirator confirmed that defendant AMOAKO told her the same

23   thing and asked defendant ARMSTEAD to pick her up.

24   <u>Overt Act No. 288:</u>  On July 18, 2024, using coded language,

25   defendant EVANS told defendant ARMSTEAD that he had been collecting

26   money from sex workers on Long Beach Boulevard for the past few days.

27   Defendant ARMSTEAD, using coded language, asked him to send the

28   address of defendant EVANS's location.

Overt Act No. 289:  On July 28, 2024, defendant ARMSTEAD, using coded language on Instagram, offered to sell an unindicted co-conspirator promethazine with codeine for "$100 a line."

Overt Act No. 290:  On July 31, 2024, using coded messages on Instagram, defendant ARMSTEAD and defendant ROBINSON discussed transporting sex workers from the San Fernando Valley.

Overt Act No. 291:  On August 13, 2024, using coded language on Instagram, defendant PHILLIPS recruited a potential sex worker by promising, among other things, "All I need is 30 days we gone have everything car and house."  Defendant PHILLIPS further told her that he only wanted to pimp her short term to accumulate wealth, which they would do together because she would make $1,000 a day.  He promised that she would eat well, be treated well, and would never want to leave him.  The unidentified female agreed to work for defendant PHILLIPS, and they discussed when she would start.

Overt Act No. 292:  On August 16, 2024, using coded language on Instagram, defendant PHILLIPS told an unidentified person that he currently had two sex workers.  The unidentified person criticized defendant PHILLIPS for beating his sex workers.

Overt Act No. 293:  On September 26, 2024, using coded language on Instagram, Victim 10 asked defendant YOUNG to help her after she was raped by a John and left naked on the highway.

Overt Act No. 294:  On September 26, 2024, defendant YOUNG and an unindicted co-conspirator drove a vehicle with Victim 16, a then 15-year-old girl, around the Figueroa Corridor, while attempting to recruit another victim who was walking on the blade.

Overt Act No. 295:  On September 29, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he found a third

party to make a Megapersonals.com account for Victim 10 to post sex advertisements.

Overt Act No. 296:  On October 3, 2024, using coded messages on Instagram, defendant EVANS told an unidentified person that he had previously trafficked a minor victim known as "Temptation." Defendant EVANS explained that defendant ARMSTEAD also used to pimp "Temptation" when the victim was a minor.

Overt Act No. 297:  On October 4, 2024, on Instagram, defendant PHILLIPS told an unidentified female, "baby i live Ina hoovas I be with them everyday," claiming his allegiance to the Hoovers gang.

Overt Act No. 298:  On October 9, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that his sex workers left him, explaining that one female ran out of the room begging defendant EVANS not to beat her.

Overt Act No. 299:  On October 24, 2024, using Instagram, defendant EVANS sent defendant BROOKS a posted advertisement for the sale of verified accounts on various commercial sex platforms, to assist defendant BROOKS in his sex trafficking.

Overt Act No. 300:  On October 24, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that he was picking up a sex worker from an "out-call" and that he just got a new sex worker, who he described as a "Lil Spanish hoe from San Diego." Defendant EVANS stated he saw the new sex worker at the Stadium Inn and that he recruited her on Figueroa Street.  Defendant EVANS explained that the new sex worker responded to defendant EVANS's Instagram story and then defendant EVANS picked her up and recruited her away from her previous pimp.

1     Overt Act No. 301:  On October 28, 2024, using coded messages on
2   Instagram, defendant AMOAKO asked defendant EVANS where defendant
3   EVANS was, to which defendant EVANS replied that he was in the
4   hundreds blocks in Hoover territory and that defendant BROOKS needed
5   his help resolving an issue between two sex workers.

6     Overt Act No. 302:  On October 30, 2024, using coded messages on
7   Instagram, defendant EVANS asked defendant AMOAKO for oxycodone and
8   defendant AMOAKO replied that he had two pills left.  Defendant EVANS
9   said he would pick up his sex worker and then get the oxycodone from
10  defendant AMOAKO.

11    Overt Act No. 303:  On October 30, 2024, defendant ISREL posted
12  a video on Instagram featuring defendant ISREL and three unidentified
13  females, in which defendant ISREL recruits the women, exclaiming, "We
14  gonna go to the top."  One of the women stated, "I thought yo bitch
15  was the prize," referring to his sex worker.  Defendant ISREL
16  replied, "I'm the prize in the situation that's why I come with a
17  choosing fee you know."

18    Overt Act No. 304:  On November 2, 2024, which is the 112
19  Hoovers "Hood Day," defendant EVANS posted an Instagram story of
20  himself holding two semi-automatic pistols while he wore a shirt that
21  read "112 General" referencing the 112 Hoovers.

22    Overt Act No. 305:  On November 3, 2024, using coded language on
23  Instagram, defendant EVANS told an unidentified person that he would
24  pick them up but he was waiting for one of his sex workers to finish
25  an "in-call" date.

26    Overt Act No. 306:  On November 10, 2024, using coded messages
27  on Instagram, defendant EVANS told an unindicted co-conspirator that
28  defendant EVANS made his sex workers work 12-hour shifts and that he

was aspiring to make their feet bleed, their bunions burst, and make them "stand outside forever like the Statue of Liberty."

Overt Act No. 307:  On November 15, 2024, using coded Instagram messages, defendant ISREL asked defendant AMOAKO for oxycodone, to which defendant AMOAKO replied that he was at House of Hotties.

Overt Act No. 308:  On November 30, 2024, using coded messages on Instagram, defendants AMOAKO and BROOKS discussed their sex workers' current locations and dates.  Defendants AMOAKO and BROOKS bragged that they were intrinsically skilled pimps.

Overt Act No. 309:  On November 30, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that his sex worker was stabbed by another sex worker who was drunk, and that he wanted revenge.  Defendant EVANS and the unidentified co-conspirator discussed whether defendant EVANS exacting revenge would cause strife within the Hoover gang.  The other user reminded defendant EVANS that "Ain't nobody bigger than the program," referring to the Hoovers.  Defendant EVANS expressed frustration that he let his sex worker get threatened and did not retaliate "for the bigger cause of the set."

Overt Act No. 310:  On December 9, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that he was out of town with his sex worker, and that his sex worker was on a commercial sex date.

Overt Act No. 311:  On December 11, 2024, using coded language on Instagram, defendant EVANS told an unidentified co-conspirator which streets were used as blades in Vallejo and Oakland, and explained that the blade in San Francisco was shut down.

<u>Overt Act No. 312</u>:  On December 14, 2024, using coded language on Instagram, defendant EVANS and an unidentified co-conspirator discussed a sex worker that they both trafficked.  Defendant EVANS said that when he "got her" she had already been with five other pimps.  A week later, on December 21, 2024, using coded messages on Instagram, the unidentified co-conspirator asked EVANS for advice on whether a sex worker should be beaten for being too comfortable with a sex buyer, to which defendant EVANS responded, "Hell yea," and confirmed that disciplinary action was necessary.

<u>Overt Act No. 313</u>:  On December 17, 2024, through coded messages on Instagram, defendant EVANS told an unidentified person, "I'm from Hoova I pimp that's my income but I ain't no fkn soft ass pimp," also adding that he and defendant ARMSTEAD had "been holding the set down hooves wise for years now" and that it was time for defendant EVANS to increase his profits.

<u>Overt Act No. 314</u>:  On December 23, 2024, using coded language on Instagram, defendant YOUNG told defendant HARRIS that defendant YOUNG was "trapping selling all drugs," referring to distributing drugs.

<u>Overt Act No. 315</u>:  On December 25, 2024, using coded language on Instagram, defendant YOUNG told defendant HARRIS that he knew defendant HARRIS was pimping minors and that it was dangerous. Defendant YOUNG then told defendant HARRIS that he had one of defendant HARRIS's sex workers and that defendant HARRIS could not have her back.

<u>Overt Act No. 316</u>:  On December 30, 2024, using coded language in Instagram messages, defendant ISREL told defendant AMOAKO to come to Las Vegas so defendant ISREL could teach him about how to use

prostitutes to steal from Johns, also known as "reaching."  Defendant
ISREL stated he made $10,000 to $100,000 for watches stolen from
Johns.  Defendant ISREL said that he and defendant AMOAKO make Hoover
pimps look good now, as past perceptions of Hoover pimps were bad.

> (i) Defendant HARRIS Sex Trafficked Victim 17, a then-16-
> Year-Old Girl, Produced Child Pornography of Victim
> 17, Provided Victim 17 With a Fake Identification
> Card, and Transported Victim 17 Around the Country for
> Sex Trafficking

Overt Act No. 317:  In and around December 2024 until at least
February 2025, defendant HARRIS engaged Victim 17, a then-16-year-old
girl, in commercial sex, including by grooming and recruiting Victim
17 for commercial sex work, promising to buy her clothing, pay for
beauty treatments, and buy anything she wanted, if she worked for
him, and teaching Victim 17 the "rules" of commercial sex work.

Overt Act No. 318:  In and around December 2024, defendant
HARRIS provided a fake California identification card to Victim 17,
with a birthdate in 1999.  Defendant HARRIS instructed Victim 17 to
use this false identification to rent hotel rooms, Airbnbs, and cars,
and to use the false identification any time production of
identification was required, including for contact with law
enforcement.

Overt Act No. 319:  On December 2024 until at least February
2025, defendant HARRIS told Victim 17 that his sex workers were
required to work seven days a week, and required a quota of $1,500 to
$2,000 per day for sex work.  During this period, Victim 17 made
approximately $14,000 per week for sex work, and gave all of the
earnings to defendant HARRIS.

Overt Act No. 320:  In or around December 2024 until at least February 2025, defendant HARRIS had Victim 17 engage in commercial sex acts at the Stadium Inn.

Overt Act No. 321:  In or around December 2024 until at least February 2025, defendant HARRIS transported Victim 17 from Los Angeles, California to Phoenix, Arizona, for the purpose of commercial sex work, approximately four times.

Overt Act No. 322:  In February 2025, defendant HARRIS transported Victim 17 to different states for the purpose of commercial sex work and directed her to conduct commercial sex dates on blades in Los Angeles and San Diego, California, Phoenix, Arizona, and Denver, Colorado.

Overt Act No. 323:  In or around December 2024 until at least February 2025, defendant HARRIS directed Victim 17 to charge specific prices for commercial sex work.

Overt Act No. 324:  In or around December 2024 until at least February 2025, defendant HARRIS took photographs of Victim 17, and directed her to take photographs, to be posted as online advertisements for commercial sex, including on Megapersonal.

Overt Act No. 325:  In or around December 2024 until at least February 2025, defendant HARRIS punched, smacked, and beat Victim 17 to discipline her and ensure compliance in being sex trafficked.

Overt Act No. 326:  In or around December 2024 until at least February 2025, defendant HARRIS distributed oxycodone to Victim 17 to make her more compliant, and to exert control over Victim 17 by fostering a drug dependency.

1    Overt Act No. 327:  On December 12, 2024, using coded text
2  messages, defendant HARRIS directed Victim 17 to send him photographs
3  so he could post a sex advertisement for her.

4    Overt Act No. 328:  On December 23, 2024, defendant HARRIS
5  monitored Victim 17 while she was working on the street to pick up
6  commercial sex dates.  Using coded language in text messages,
7  defendant HARRIS and Victim 17 discussed the prices of her commercial
8  sex dates and Victim 17 confirmed she would give defendant HARRIS the
9  earnings from her dates.

10    Overt Act No. 329:  On December 23, 2024, using coded language
11  in text messages, defendant HARRIS directed Victim 17 to bring a John
12  to an ATM in order to withdraw money to pay for a commercial sex act,
13  and then directed Victim 17 to tell the commercial sex buyer to give
14  $70 cash and pay the rest of the money to defendant HARRIS via Zelle.

15    Overt Act No. 330:  On December 23, 2024, defendant HARRIS
16  received reports from Victim 17, using coded language in text
17  messages, about the money Victim 17 had earned for him from multiple
18  commercial sex dates.

19    Overt Act No. 331:  On December 24, 2024, using coded language
20  in text messages, Victim 17 reported to defendant HARRIS that Victim
21  17 needed to use the bathroom and defendant HARRIS gave her
22  permission to do so.

23    Overt Act No. 332:  On December 25, 2024, using coded text
24  messages, Victim 17 reported to defendant HARRIS regarding her
25  commercial sex dates and asked defendant HARRIS to take her to get
26  more condoms.  They discussed a commercial sex date involving two
27  Johns, and defendant HARRIS directed Victim 17 to charge more because
28  the date was taking more than the allotted time.

1      Overt Act No. 333:  Between December 27, 2024, and December 30,

2  2024, using coded text messages, defendant HARRIS and Victim 17

3  continued to discuss the details of Victim 17's commercial sex dates

4  and the proceeds of these dates.

5      Overt Act No. 334:  On December 30, 2024, using coded language

6  in text messages, defendant HARRIS instructed Victim 17 to wait

7  outside a hotel room for another sex worker to finish using the room,

8  directing Victim 17 to enter the room once the other sex worker

9  exited.  Victim 17 later reported that she left the proceeds of the

10  dates for defendant HARRIS in the hotel dresser.

11      Overt Act No. 335:  On January 2, 2025, defendant HARRIS sent a

12  photo to Victim 17 depicting a hand holding pink pills with "K, 56"

13  stamped on them, resembling oxycodone pills.  Victim 17 indicated

14  that she had a buyer for the pills and asked defendant HARRIS how

15  much they were, to which defendant HARRIS told Victim 17 they cost

16  $20.

17      Overt Act No. 336:  In or around January 2025, defendant

18  ROBINSON recruited Victim 17 to work for him, including driving her

19  to the Stadium Inn to collect her belongings from defendant HARRIS.

20  When they arrived, defendant HARRIS was at the hotel, and both

21  defendants HARRIS and ROBINSON instructed Victim 17 to choose one of

22  them as her pimp.  Victim 17 chose defendant ROBINSON.  Defendant

23  HARRIS asked defendant ROBINSON for permission to hit Victim 17 as an

24  exit fee, which defendant ROBINSON allowed.  Defendant HARRIS hit

25  Victim 17 in the face.  Following the assault, defendant ROBINSON

26  took Victim 17 back to the Figueroa Corridor to continue commercial

27  sex work.  Soon after, Victim 17 called defendant HARRIS to pick her

28  up, and started working for him again.

Overt Act No. 337:  In early January 2025, defendant HARRIS transported Victim 17 from Los Angeles, California, to San Diego, California, for the purpose of commercial sex work.

Overt Act No. 338:  On January 29, 2025, while in Los Angeles, defendant HARRIS produced child sexual abuse material of Victim 17, which included a video from defendant HARRIS's point of view while he held the camera and showed Victim 17 performing oral copulation on defendant HARRIS.

Overt Act No. 339:  On February 9, 2025, until at least February 12, 2025, defendant HARRIS produced approximately two child sexual abuse material videos of Victim 17, which included defendant HARRIS recording Victim 17 performing oral copulation on defendant HARRIS, and defendant HARRIS engaging in vaginal intercourse with Victim 17 in different positions.

Overt Act No. 340:  On February 11, 2025, defendant ROBINSON and an unknown co-conspirator drove up to Victim 17 while she was on the blade in Hoovers territory, and the unknown co-conspirator beat Victim 17.

Overt Act No. 341:  In or around February 2025, in Phoenix, Arizona, defendant HARRIS directed Victim 17 and three other sex workers to engage in commercial sex work and earn $1,000 each, so that he could purchase a firearm.

Overt Act No. 342:  In or around February 2025, defendant HARRIS transported Victim 17 and three other sex workers from Phoenix, Arizona to Denver, Colorado, for the purpose of engaging in commercial sex work.

1    Overt Act No. 343:  In or around February 2025, in Denver,

2   Colorado, defendant HARRIS directed Victim 17 to engage in commercial

3   sex work and forced Victim 17 to walk the blade in the snow.

4    Overt Act No. 344:  On February 21, 2025, defendant HARRIS

5   transported Victim 17 and three other sex workers from Denver,

6   Colorado to Ogallala, Nebraska, with the intent to drive through

7   Nebraska to Chicago, Illinois and sex traffic the sex workers in

8   Chicago.  While in Ogallala, Nebraska defendant HARRIS was stopped on

9   the highway and his firearm was found in the vehicle.  To avoid being

10  arrested, defendant HARRIS directed Victim 17 to tell law enforcement

11  that his firearm belonged to Victim 17 because Victim 17 was a minor.

12          (j)   While in Custody, Defendant HARRIS Worked with an
                  Unindicted Co-Conspirator to Continue Sex Trafficking
13                Victims

14   Overt Act No. 345:  On March 5, 2025, defendant HARRIS was

15  arrested on charges related to sex trafficking Victim 17 and was

16  transported to, and held in custody in, Nebraska.

17   Overt Act No. 346:  From approximately March 24, 2025, to March

18  30, 2025, while defendant HARRIS was in custody in Nebraska for sex

19  trafficking Victim 17, defendant HARRIS and an unindicted co-

20  conspirator continued to sex traffic defendant HARRIS's sex workers.

21  Through jail calls, defendant HARRIS and an uncharged co-conspirator

22  discussed the sex workers, and defendant HARRIS directed the

23  uncharged co-conspirator to pass messages to the sex workers,

24  including directing them to testify in his case.  During a call on

25  March 28, 2025, the same uncharged co-conspirator stated that he did

26  not have any money and asked defendant HARRIS if he should pick up a

27  new sex worker who could earn money.

28

1    Overt Act No. 347:  On March 25, 2025, while defendant HARRIS

2  was in custody in Nebraska for sex trafficking Victim 17, he

3  continued to sex traffic females, including Victim 18, who reported

4  to him in a phone call that she was engaging in commercial sex dates.

5    Overt Act No. 348:  On March 26, 2025, while defendant HARRIS

6  was in custody in Nebraska for sex trafficking Victim 17, he called

7  an uncharged co-conspirator, who connected a three-way call with

8  Victim 9, and defendant HARRIS directed Victim 9 to testify in his

9  sex trafficking case in a manner favorable to defendant HARRIS.

10    Overt Act No. 349:  From approximately March 27, 2025, until at

11  least March 31, 2025, while defendant HARRIS was in custody in

12  Nebraska for sex trafficking Victim 17, he continued to sex traffic

13  Victim 15 and directed her over jail calls.  In these calls, using

14  coded language, Victim 15 apprised defendant HARRIS of the proceeds

15  that she earned for him through commercial sex work.  During a call

16  on March 31, 2025, using coded language and to manufacture an alibi

17  for why he was in Chicago, defendant HARRIS instructed Victim 15 to

18  search for concerts in Chicago and send him information so he could

19  claim he was traveling to Chicago for a concert, and not to sex

20  traffic Victim 17  Defendant HARRIS berated Victim 15 during this

21  call, repeatedly calling Victim 15 "dumb" for not understanding he

22  was trying to speak in code.

23        (k)  Defendant ISREL Used Victim 3 to Straw Purchase
             Firearms He Used to Promote the Hoover Enterprise
24

25    Overt Act No. 350:  On November 24, 2023, using direct messages

26  on Instagram, defendant ISREL sent Victim 3 a photograph of what

27  appeared to be a Century Arms Mini Draco Pistol, along with coded

28  messages indicating that he wanted this gun and that it cost $1,100.

1  Victim 3 replied that she did not really "know guns" but that
2  defendant ISREL should get it if it was a good price and he wanted
3  it.

4      Overt Act No. 351:  On February 13, 2024, at defendant ISREL's
5  direction, Victim 3 purchased a Micro Draco pistol, serial #: 23PMD-
6  47926 (the "Draco Pistol") and a Five-Seven pistol, serial #:
7  386445475 (the "FN Pistol") from the dealer S&S Wholesale Arms LLC in
8  Henderson, Nevada.

9      Overt Act No. 352:  After Victim 3 purchased the Draco Pistol
10  and FN Pistol on February 13, 2024, defendant ISREL paid Victim 3
11  $1,100 in three Cash App payments between February 17, 2024 and
12  February 27, 2024, which was the purchase price defendant ISREL
13  quoted for the Draco Pistol in his Instagram messages to Victim 3.

14      Overt Act No. 353:  Between February 14, 2024 and May 14, 2024,
15  in Los Angeles, California, defendant ISREL filmed a music video in
16  which defendant ISREL is wearing luxury clothing brands and is seen
17  holding the Draco Pistol, along with large sums of cash, high-value
18  watches, and expensive alcohol.  In the video, defendant ISREL
19  promotes the Enterprise by making several statements glorifying the
20  Hoovers, portraying a luxurious pimping lifestyle as a means of
21  recruitment, and brandishing firearms to instill fear in Hoovers
22  rivals, victims, and the community, including the following: (1) "She
23  don't wanna fuck me she want to fuck my car.  Draco with the drum.
24  It's to get the job done," glorifying the use of a firearm to recruit
25  women; (2) "screaming our city they don't come across Florence.
26  TinyLok, that's an awful lot of orange," referencing rivals not
27  crossing Florence Avenue because they will run into defendant ISREL
28  ("TinyLok") and other Hoovers (wearing their gang color orange) in

Hoover territory; and (3) "three hoes with me but the SRT two-door, Louboutin stepping bloody sole on the floor," referring to having three sex workers, and playing on the double entendre of the designer Louboutin shoe having a red sole and the phrase "bloody stepping," which refers to sex workers who walk the blade until their feet bleed.



Overt Act No. 354:  On May 19, 2024, in Las Vegas, Nevada, defendant ISREL, a convicted felon, was found in possession of the FN Pistol in a vehicle.

5.    **2025: Enterprise Members Distributed Drugs; Sex Trafficked Minors and Through Force, Fraud, and Coercion; Assaulted and Robbed Victim Who Shunned Sex Trafficking Recruitment Efforts**

(a)    Enterprise Members Continued to Sex Traffic, Coerced and Intimidated Victims, Committed Assaults to Further the Hoovers' Reputation for Violence, and Distributed Drugs

Overt Act No. 355:  On January 7, 2025, using coded messages on Instagram, defendant ROBINSON told defendant PHILLIPS that he was getting promethazine with codeine and that he would meet up with defendant PHILLIPS.

1    Overt Act No. 356:  On January 9, 2025, using coded language on
2    Instagram, Victim 19 asked defendant HARRIS to take her to the blade,
3    and later told him that she had a commercial sex date and was in the
4    motel room.

5    Overt Act No. 357:  On January 10, 2025, defendant BROOKS posted
6    a photograph on Instagram depicting an unidentified woman in thong
7    underwear branded with a "Buddha" tattoo, defendant BROOKS's moniker,
8    on her rear end, including a caption that referenced defendant
9    BROOKS's membership in the Hoovers.

10   Overt Act No. 358:  On January 21, 2025, through coded messages
11   on Instagram, defendant YOUNG asked defendant EVANS if defendant
12   YOUNG could purchase an entire bottle of promethazine with codeine
13   from defendant EVANS for further distribution, which defendant EVANS
14   agreed to sell to defendant YOUNG for $140.  Defendant YOUNG said he
15   was at the Stadium Inn, and defendant EVANS said he would meet
16   defendant YOUNG there, later confirming that he had arrived.

17   Overt Act No. 359:  On January 21, 2025, using coded messages on
18   Instagram, defendant ISREL told defendant AMOAKO to come to Miami
19   because defendant ISREL was going there to sex traffic one of his sex
20   workers, to which defendant AMOAKO acknowledged by using the "like"
21   feature.

22   Overt Act No. 360:  On January 22, 2024, defendant YOUNG and
23   uncharged Hoover gang members recorded a video of an unknown male
24   victim being beaten.  In the video, defendant YOUNG punched and
25   kicked the victim, yelling "fuck skirts," which is a derogatory term
26   for a rival gang, the Main Street Crips.

27   Overt Act No. 361:  On January 23, 2025, using coded messages on
28   Instagram, defendant EVANS complained to an unidentified person that

the Johns are sick of seeing the same sex workers on the Figueroa
Corridor and it is a problem.  Defendant EVANS declared that the
Figueroa Corridor is a "starter track" and he plans to move his sex
workers around the "map."  Defendant EVANS proudly bragged about
Hoover pimps being different and the most "pimpish," and explained
this is because the gang members in their set grew up around
trafficking so it is "in" them.

Overt Act No. 362:  On January 25, 2025, using coded messages on
Instagram, defendant EVANS coached defendant HARRIS on how to traffic
sex workers.

Overt Act No. 363:  On January 25, 2025, using coded language on
Instagram, defendant HARRIS asked defendant EVANS to post an
advertisement on Instagram for promethazine with codeine on defendant
HARRIS's behalf.  Defendant HARRIS stated that the drugs cost $170
per line for defendant EVANS but directed defendant EVANS to post a
price of $200 per line when further distributing the drugs to others.
Defendant HARRIS also offered to provide marijuana and oxycodone to
defendant EVANS.

Overt Act No. 364:  On January 25, 2025, using coded messages on
Instagram, defendant HARRIS told defendant EVANS they were going to
physically discipline defendant HARRIS's sex worker for complaining
that she was in pain, was covered in bruises, and that defendant
HARRIS only cared about his money.

Overt Act No. 365:  On January 25, 2025, using coded language on
Instagram, defendant HARRIS told Victim 19 that he would consider
allowing Victim 19 to come back and work for him if she paid a new
choosing fee of $1,200.

<u>Overt Act No. 366:</u>  On January 27, 2025, using coded messages on Instagram, defendant PHILLIPS told a pimp who his sex worker left him for that he needed video proof that the sex worker was beaten and that if the new pimp could not provide this evidence, defendant PHILLIPS would have to beat her himself to discipline her for leaving and to set an example for other sex workers that defendant PHILLIPS did not tolerate disobedience.

<u>Overt Act No. 367:</u>  On January 30, 2025, using coded messages on Instagram, defendants EVANS and ISREL coordinated a drug deal in which defendant EVANS would provide defendant ISREL with promethazine with codeine, and they agreed to meet at the Stadium Inn.

<u>Overt Act No. 368:</u>  On January 30, 2025, using coded language on Instagram, defendant HARRIS told Victim 19 that he fired another sex worker, to which Victim 19 stated that she would travel to Los Angeles to work for defendant HARRIS.  Defendant HARRIS ordered that once Victim 19 started working for him, she would work without breaks until she made $5,000.

<u>Overt Act No. 369:</u>  On March 23, 2025, an unidentified sex trafficking victim left defendant PHILLIPS to work for another pimp without paying an "exit fee."  On March 28, 2025, using coded messages on Instagram, defendant PHILLIPS demanded his exit fee and asked the victim why she was hiding in a bathroom.  The victim's new pimp wrote to defendant PHILLIPS that he saw defendant PHILLIPS drive by in a Mustang demanding exit fees and threatening to beat the victim.  Defendant PHILLIPS responded in a coded message stating that the victim could work, and if she couldn't, he would have already beaten her, but she got a pass.

1    Overt Act No. 370:  On March 24, 2025, using coded language on

2    Instagram, defendant YOUNG told defendant HARRIS that he was selling

3    promethazine with codeine, and defendant YOUNG offered to sell

4    defendant HARRIS four lines for $500.

5    Overt Act No. 371:  On April 8, 2025, defendant YOUNG recorded a

6    video of two unidentified women exiting YOUNG's car and attacking an

7    unidentified commercial sex worker victim, punching, kicking, and

8    dragging the victim.  During the attack, YOUNG yelled "Westside

9    Hoover, groove that bitch, bitch Hoover Street, get up out the set,

10   beat that bitch up on Hoover, drag that bitch, drag that hoe, keep

11   playing with the game bitch, stupid bitch, come on get in the car, H

12   up, drag her away from the car, we out of here."  The victim screamed

13   and cried throughout the attack.

14   Overt Act No. 372:  On April 9, 2025, defendant YOUNG saved a

15   screenshot image of a message from a Department of Children and

16   Family Services social worker who was attempting to make contact with

17   Victim 20, a then-16-year-old girl.

18   Overt Act No. 373:  On May 24, 2025, using coded language on

19   Instagram, defendants EVANS and HARRIS discussed transporting sex

20   workers to Las Vegas, Nevada, for the purpose of sex trafficking.

21   Overt Act No. 374:  On June 4, 2024, defendant YOUNG posted a

22   story on Instagram, which showed defendants YOUNG and EVANS, and

23   other uncharged Hoover gang members, one of which is heard saying

24   "West Side Hoovers."

25          (b)   Defendant BROOKS Sex Trafficked Victim 21, a then-17-
                  Year-Old Girl, Through Force, Fraud, and Coercion
26
     Overt Act No. 375:  In or around November 2024, Victim 21, a
27
     then-17-year-old girl, was taken by defendant BROOKS to be branded
28

94

with a tattoo of defendant BROOKS's moniker, "Buddha," across her neck.

Overt Act No. 376:  From approximately December 2024, until at least April 2025, defendant BROOKS trafficked Victim 21 on the Figueroa Corridor, in the Hollywood area, and in Long Beach. Defendant BROOKS determined how much Victim 21 charged for commercial sex acts, how often she would work, and who she was permitted to speak to.  Defendant BROOKS required all of Victim 21's earnings be turned over to him.  If Victim 21 needed food or clothing, she relied on defendant BROOKS to purchase it for her.

Overt Act No. 377:  From approximately December 2024, until at least April 2025, defendant BROOKS took Victim 21's birth certificate, identification card, and bank card into his possession and did not return them to Victim 21.

Overt Act No. 378:  From approximately December 2024, until at least April 2025, defendant BROOKS threatened to hurt Victim 21's family if she misbehaved, tried to run away from him, or stated she wanted to stop sex work.

Overt Act No. 379:  From approximately December 2024, until at least April 2025, defendant BROOKS repeatedly assaulted Victim 21, including stabbing her with scissors, repeatedly yanking out her earrings until her earlobes ripped, slapping, punching, and kicking her, pulling her hair, and causing injuries including black eyes, busted lips, and bruises, as well as trapping Victim 21 in his bedroom, locking the door and putting a stick in the window to prevent Victim 21 from escaping.

Overt Act No. 380:  In or around December 2024, defendant BROOKS obtained a fake identification card for Victim 21 to use for the purpose of renting hotel rooms for commercial sex dates.

Overt Act No. 381:  In or around January 2025, defendant BROOKS put his hand over Victim 21's mouth, picked her up, and forced her into the trunk of his car.  Defendant BROOKS drove Victim 21 from Los Angeles to Riverside, California, with Victim 21 in the trunk of his car the entire time, and upon arriving at a home in Riverside, defendant BROOKS beat Victim 21.  From approximately December 2024, until at least April 2025, defendant BROOKS took Victim 21 to Riverside, California, more than fifteen different times and beat her, before locking her in a bedroom that had no escape route.

Overt Act No. 382:  In or around January 2025, defendant BROOKS kicked Victim 21 in the stomach, one week after Victim 21 told defendant BROOKS that she was pregnant with his child.

Overt Act No. 383:  In or around January 2025, defendant BROOKS refused to take Victim 21 to the hospital when she bled profusely from her vagina, days after he kicked her in the stomach.

Overt Act No. 384:  From approximately February 2025, until at least April 2025, defendant BROOKS provided drugs to Victim 21, including oxycodone, codeine, promethazine, and cocaine, to keep Victim 21 awake and warm while working long hours as a sex worker on the street in order to prolong her ability to engage in sex work.

Overt Act No. 385:  In or around January or February 2025, defendant BROOKS stabbed Victim 21 in the leg with a pair of scissors.

1      <u>Overt Act No. 386:</u>  In or around February 2025, defendant BROOKS

2  attempted to shoot Victim 21 in the foot, discharging a firearm,

3  resulting in the bullet hitting the floor.

4      <u>Overt Act No. 387:</u>  On an unknown date, while driving a vehicle,

5  defendant BROOKS shot a firearm at Victim 21, nearly missing her

6  face.

7      <u>Overt Act No. 388:</u>  In or around April 2025, defendant BROOKS

8  punched Victim 21 so hard that she flew back off her feet and onto

9  the ground, causing road rash on Victim 21's back.

10     <u>Overt Act No. 389:</u>  On an unknown date, defendant BROOKS took

11 Victim 21 to an isolated place and beat her so badly she thought she

12 was going to die.

13     <u>Overt Act No. 390:</u>  In or around April 2025, defendant BROOKS

14 hit Victim 21 in the mouth so hard that her tooth chipped and a

15 bracket from her braces fell off.

16          (c)  <u>Defendant YOUNG Sex Trafficked Victim 20, a then-16-
                 Year-Old Girl</u>

17

18     <u>Overt Act No. 391:</u>  On February 21, 2025, using coded language

19 on Instagram, defendant YOUNG and Victim 20, a then-16-year-old-girl,

20 discussed picking up a female friend of hers, who would also perform

21 sex work for defendant YOUNG.

22     <u>Overt Act No. 392:</u>  On February 23, 2025, using coded language

23 on Instagram, Victim 20 informed defendant YOUNG that her regular sex

24 customer was going to pick her up and asked if defendant YOUNG could

25 get her a room for the commercial sex date.

26     <u>Overt Act No. 393:</u>  On February 25, 2025, using coded language

27 on Instagram, Victim 20 informed defendant YOUNG that her regular sex

28

customer was going to pick her up and she would inform defendant YOUNG when she had money for him.

Overt Act No. 394:  On February 25, 2025, using coded language on Instagram, Victim 20 informed defendant YOUNG that she would pay him for a pair of heels but would likely not work for him after this payment because he already has other sex workers.

(d)  Defendant YOUNG Sex Trafficked Victim 22 as a then-17- and 18-Year-Old Girl, Through Force, Fraud, and Coercion

Overt Act No. 395:  In or around June 2024, before Victim 22 turned 18 years old, defendant YOUNG told Victim 22 the rules for his sex trafficking, purchased sex working outfits for Victim 22, and told Victim 22 to walk the blade to solicit sex dates.  Defendant YOUNG told Victim 22 his rules, including not to be "out of pocket," that is, disobedient to him, and not to talk to black men.  Defendant YOUNG instructed Victim 22 to charge $80 for oral copulation and $120 for "full service" which included oral copulation and vaginal intercourse, and to leave the door of the hotel room door open while engaging in sex work.  Defendant YOUNG instructed Victim 22 to always use a condom, that he would give her 10 condoms, and that she would have to use them all, and threatened to beat Victim 22 if she did not secure 10 dates and use all the condoms.

Overt Act No. 396:  From June 9, 2024, until August 4, 2024, defendant YOUNG sex trafficked Victim 22 while she was a minor.

Overt Act No. 397:  On August 3, 2024, defendant YOUNG took Victim 22 to the Figueroa Corridor, told her to take off her normal clothing, and directed her to stand on the corner to solicit commercial sex dates.  Victim 22 called a friend to pick her up and take her home; however, when she got home, defendant YOUNG was

waiting for her at her house.  Defendant YOUNG pulled Victim 22 by her hair and into his car, and shut the door of the car.

Overt Act No. 398:  From approximately June 2024, until at least April 2025, defendant YOUNG determined how much Victim 22 charged for commercial sex acts, how often she would work, and who she was permitted to speak to.

Overt Act No. 399:  From approximately June 2024, until at least April 2025, defendant YOUNG collected money directly after Victim 22 completed commercial sex dates, ordering her to take the money to him if she engaged in a "car date," and leave the money in the hotel room if she engaged in a "hotel date."

Overt Act No. 400:  From approximately June 2024, until at least April 2025, in addition to Victim 22, defendant YOUNG also sex trafficked at least three other minors, including Victim 20, Victim 23, and Victim 12, out of the Mission Motel in Long Beach and the Stadium Inn.

Overt Act No. 401:  From approximately June 2024, until at least April 2025, defendant YOUNG picked up Victim 22 when she was done working as a sex worker for the night and directed her to put on normal clothes before entering the car in order to avoid law enforcement attention.

Overt Act No. 402:  From approximately June 2024, until at least April 2025, defendant YOUNG distributed drugs to Victim 22 in order to help her stay awake while she was engaging in commercial sex work.

Overt Act No. 403:  From approximately August 2024, until at least February 19, 2025, defendant YOUNG beat Victim 22 nearly every day, including slapping Victim 22 in the face and body, and pulling

her wig so hard that she would fall to the ground and pieces of her hair would come out.

Overt Act No. 404:  On a day between approximately June 2024, until at least April 2025, defendant YOUNG threatened to have a Hoover enforcer, "Lady Poke," beat Victim 22 if she ever tried to leave him or if he went to jail.

Overt Act No. 405:  From approximately June 2024, until at least April 2025, defendant YOUNG required Victim 22 to work on the Figueroa Corridor, Long Beach Avenue, and Sepulveda Boulevard, while defendant YOUNG monitored her from his vehicle.  If Victim 22 tried to hide from defendant YOUNG, he would sometimes hit her in the face, but more often in the arms, legs, or torso, in order to preserve her face for commercial sex dates.

Overt Act No. 406:  On multiple days between approximately June 2024, until at least April 2025, defendant YOUNG threatened to shoot up the home of Victim 22's family member if she ever left him.

Overt Act No. 407:  In late 2024, to further exert control and dominance over Victim 22, defendant YOUNG raped Victim 22, during which he forced his fingers and penis into Victim 22's vagina against her will, and held down her arms.

Overt Act No. 408:  On January 27, 2025, defendant YOUNG assaulted Victim 22, pulling off her wig and slamming her body into a wall.

Overt Act No. 409:  In or around January 2025, Victim 22 told defendant YOUNG that she no longer wanted to engage in commercial sex work, to which defendant YOUNG responded by beating her for seven days straight, multiple times a day.  Defendant YOUNG justified his beatings to Victim 22 as discipline for her unwillingness to work,

desire to leave, failure to give him her phone passcode, and for her revealing to people that he pimped minors.  When Victim 22 reiterated she wanted to stop commercial sex work, defendant YOUNG told her to "shut the fuck up, you're mine" and "you're my property and you will do what I say."

Overt Act No. 410:  On February 12, 2025, defendant YOUNG posted sex advertisements of Victim 22, Victim 20, and Victim 23, using a Megapersonal account which utilized Victim 22's phone number.

Overt Act No. 411:  On February 19, 2025, defendant YOUNG overheard a conversation that Victim 22 was having with a friend about leaving defendant YOUNG, to which defendant YOUNG responded by slapping Victim 22 in the face and taking her cell phone.

Overt Act No. 412:  On February 19, 2025, defendant YOUNG tried to force Victim 22 into a room at the Mission Motel in Lynwood, California, after she packed up her items to leave him, and defendant YOUNG took away her phone.  Victim 22 escaped by jumping in a stranger's car and asking the stranger to drive her to a police station.

Overt Act No. 413:  On February 19, 2025, defendant YOUNG threatened to kill Victim 22 and Victim 22's mother after Victim 22 ran away from him after he assaulted her at the Mission Motel in Lynwood, California.

Overt Act No. 414:  On February 19, 2025, defendant YOUNG spoke to Victim 22's family member, and threatened to kill Victim 22 and the family member.  Defendant YOUNG used his access to Victim 22's phone to turn off Victim 22's location services so that Victim 22's family member could not find her.

Overt Act No. 415:  On March 3, 2025, while Victim 22 was taking
a shower, defendant YOUNG hit her in the back of the head and then
hit her face so hard she fell to the ground.  Defendant YOUNG video
recorded his assault of Victim 22.  After he beat her, defendant
YOUNG forced her to engage in commercial sex work on the Figueroa
Corridor.

Overt Act No. 416:  In or around April 2025, at the Stadium Inn,
defendant YOUNG instructed Victim 22 to beat Victim 20, however she
refused to do so because Victim 20 was a minor.

Overt Act No. 417:  In or around April 2025, at the Stadium Inn,
defendant YOUNG beat Victim 20, including but not limited to pushing
Victim 20 onto the ground and dragging her by the hair to force
Victim 20 to lay outside of a hotel room.  An uncharged enforcer
working with defendant YOUNG kicked Victim 20 in the body and head,
causing Victim 20's ear to bleed.

Overt Act No. 418:  On May 9, 2025, at a Hoover "Hood Day" for
the 59 set of Hoovers, defendant YOUNG saw Victim 22 in the crowd and
announced he was "going to kill that bitch."

Overt Act No. 419:  From June 2025, until at least July 2025,
defendant YOUNG attempted to recruit Victim 22 to come back to work
for him, promising not to lay his hands on her any longer.

(e)    Defendant CROCKHAM Directed Sex Trafficking While in
Custody

Overt Act No. 420:  On March 14, 2025, while defendant CROCKHAM
was in custody in Los Angeles, he engaged in at least nine recorded
phone calls in which he actively engaged in sex trafficking.  Using
coded language, defendant CROCKHAM directed a sex worker to get him
out of custody, spoke to an uncharged co-conspirator about the

whereabouts of sex workers, directed a second sex worker to get her work done so they can buy another car, and gave directions about which sex workers should stay at the current motel and which ones should go to Gardena to engage in sex work.  Defendant CROCKHAM also directed a sex worker to stay at the current hotel and focus, because her and the other sex workers should make $6,000 to $7,000 by the following Tuesday.

Overt Act No. 421:  On March 16, 2025, while in custody in Los Angeles, using coded language, defendant CROCKHAM asked a sex worker how much money was being made.

Overt Act No. 422:  On March 17, 2025, while in custody in Los Angeles, using coded language, defendant CROCKHAM and a sex worker spoke on the phone, and she reported that the police are no longer coming by the room and the other sex workers were still in their rooms.

       (f)    <u>Defendant GRAY Threw Motor Oil on Victim 24, a then-17-Year-Old Girl, When She Rejected His Recruitment, Then Defendant GRAY Assisted in Robbing Her</u>

Overt Act No. 423:  On May 19, 2025, while in a vehicle, defendant GRAY shouted at Victim 24, who was waiting at a bus stop to return home from school.  Defendant GRAY told Victim 24 that she needed a new boyfriend who didn't make her wait at bus stops.  Victim 24 responded that she did not have a boyfriend and was a minor.  Defendant GRAY threatened Victim 24, telling her to watch her mouth because they were in defendant GRAY's "hood." Defendant GRAY then exited his vehicle, walked toward Victim 24, and threw a bottle of motor oil at Victim 24, hitting her.

Overt Act No. 424:  On May 19, 2025, while defendant GRAY distracted Victim 24 by throwing a bottle of motor oil at her, an

uncharged co-conspirator ran up to Victim 24, held a firearm to the temple of her head, and forcibly ripped a gold chain from Victim 24's neck.  The uncharged co-conspirator then ran, and defendant GRAY picked him up in their vehicle.

**6.    Enterprise Members Committed Promotional Money Laundering by Using the Commercial Sex Proceeds of Victims to Cover Business Expenses to Pimp or Sex Traffic Other Victims**

(a)    Defendant AMOAKO

Overt Act No. 425:  From approximately February 2020 to March 2021, defendant AMOAKO received approximately $2,634 in commercial sex proceeds from Victim 25 in 70 Cash App payments.

Overt Act No. 426:  From approximately November 2022 to June 2024, defendant AMOAKO received approximately $709.65 in commercial sex proceeds from Victim 2 in ten Cash App payments.

Overt Act No. 427:  From approximately April 2023 to January 2025, defendant AMOAKO received approximately $43,086 in commercial sex proceeds from Victim 5 in 176 Cash App payments.

Overt Act No. 428:  From approximately February 2024 to December 2024, defendant AMOAKO received approximately $27,164.42 in commercial sex proceeds from Victim 26 in 163 Cash App payments.

Overt Act No. 429:  While pimping and sex trafficking his victims, defendant AMOAKO commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, on February 8, 2024, defendant received a $100 Cash App payment constituting commercial sex proceeds from Victim 5.  The next day, on February 9, 2024, using the proceeds derived from Victim 5's sex work, defendant AMOAKO made a $10 Cash App payment to Victim 26 with a subject line specifying "condoms."

(b)   Defendant EVANS

Overt Act No. 430:  From approximately October 2021 to August 2022, defendant EVANS received approximately $7,464.32 constituting commercial sex proceeds from Victim 27 in 51 Cash App payments.

Overt Act No. 431:  Between March 2022 and December 2022, defendant EVANS received approximately $15,307.36 in commercial sex proceeds from Victim 4 in 164 Cash App payments.

Overt Act No. 432:  While pimping and sex trafficking his victims, defendant EVANS commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, between February 7, 2022, and March 13, 2022, defendant EVANS received $1,754 in Cash App payments constituting commercial sex proceeds from Victim 27.  On March 17, 2022, using the proceeds from Victim 27's sex work, defendant EVANS made a $300 Cash App payment to Victim 4 to cover her expenses as his sex worker.

(c)   Defendant BROOKS

Overt Act No. 433:  Between approximately October 7, 2024, and November 10, 2024, defendant BROOKS received approximately $1,099 in commercial sex proceeds from Victim 10 in five Cash App payments.

Overt Act No. 434:  Between approximately December 6, 2024, and December 21, 2024, defendant BROOKS received approximately $1,140 in commercial sex proceeds from Victim 28 in five Cash App payments.

Overt Act No. 435:  While pimping and sex trafficking his victims, defendant BROOKS commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, between October 7, 2024 and November 10, 2024, defendant BROOKS received $1,099 in five Cash App

105

payments constituting commercial sex proceeds from Victim 10. On
December 6, 2024, using the proceeds from Victim 10's sex work,
defendant BROOKS made ten Cash App payments totaling $1,198 to Victim
28 to cover her expenses as his sex worker.

(d)   Defendant CROCKHAM

Overt Act No. 436:  Between approximately November 2024, and
April 2025, defendant CROCKHAM received approximately $8,502.37 in
commercial sex proceeds from Victim 29 in 97 Cash App payments.

Overt Act No. 437:  Between approximately November 2024 and
April 2025, defendant CROCKHAM received approximately $3,933.74 in
commercial sex proceeds from Victim 30 in 67 Cash App payments.

Overt Act No. 438:  While pimping and sex trafficking his
victims, defendant CROCKHAM commingled their commercial sex proceeds
in his Cash App account and used proceeds from one victim to promote
his pimping of another victim.  For example, between December 29,
2024, and December 30, 2024, defendant CROCKHAM received $116 in two
Cash App payments constituting commercial sex proceeds from Victim
29.  On December 30, 2024, using the proceeds from Victim 31's sex
work, defendant CROCKHAM made a Cash App payment of $12 to Victim 30
with a memo line "Uber to room" to cover her expenses as his sex
worker.

(e)   Defendant ISREL

Overt Act No. 439:  Between approximately June 23, 2020, and May
11, 2023, defendant ISREL collected approximately $33,438,83 in
commercial sex proceeds from Victim 1 in 170 Cash App payments.

Overt Act No. 440:  Between approximately December 1, 2022, and
February 17, 2025, defendant ISREL collected approximately $79,132.62
in commercial sex proceeds from Victim 3 in 302 Cash App payments.

Overt Act No. 441:  While sex trafficking and pimping his victims, defendant ISREL commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his trafficking and pimping of another victim.  For example, between May 9, 2023, and May 11, 2023, defendant ISREL received $810 in four Cash App payments from Victim 3, which constituted commercial sex trafficking proceeds.  On May 12, 2023, using the proceeds from Victim 3's sex work, defendant ISREL made a Cash App payment of $40 to Victim 1, with a subject line specifying "uber," to cover her expenses as his sex worker.

**NOTICE OF SPECIAL SENTENCING FACTORS REGARDING COUNT ONE**

38.  As part of their agreement to conduct and participate in the conduct of the affairs of the Hoovers Enterprise through a pattern of racketeering activity, the defendants committed the following acts:

39.  <u>Sex Trafficking of Children – 18 U.S.C. § 1591</u>

On or about the dates listed below, within the Central District of California, and elsewhere, the defendants listed below, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means the minor listed below, having had a reasonable opportunity to observe the minor and in knowing and in reckless disregard of the fact that the minor had not attained the age of 18 years, and knowing and in reckless disregard that the minor would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(2), (c).

| Dates | Defendant(s) | Minor |
|---|---|---|
| July 2023 | ROBINSON | Victim 7 |
| April 2024 | ARMSTEAD | Victim 11 |
| June 2024 – July 2024 | YOUNG | Victim 12 |
| July 2024 | HARRIS | Victim 15 |
| July 2024 | YOUNG | Victim 14 |
| December 2024 – April 2025 | BROOKS | Victim 21 |
| December 2024 – February 2025 | HARRIS | Victim 17 |
| February 2025 | YOUNG | Victim 20 |

40.  <u>Sex Trafficking by Force, Fraud, or Coercion – 18 U.S.C.</u>
     <u>§ 1591</u>

On or about the dates listed below, within the Central District of California, and elsewhere, the defendants listed below, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means the victim listed below, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means would be used to cause the victim to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1).

| <u>Dates</u> | <u>Defendant(s)</u> | <u>Victim</u> |
|---|---|---|
| April 2022 – June 2023 | AMOAKO | Victim 2 |
| December 2022 – January 2025 | EVANS | Victim 4 |
| December 2022 – February 2025 | ISREL | Victim 3 |
| April 2023 - March 2024 | AMOAKO | Victim 5 |
| June 2023 – August 2023 | ROBINSON | Victim 6 |
| September 2023 – February 2024 | PHILLIPS | Victim 8 |
| September 2023 - February 2024 | PHILLIPS | Victim 9 |
| June 2024 – July 2024 | YOUNG | Victim 13 |
| August 2024 – February 2025 | YOUNG | Victim 22 |
| December 2024 – April 2025 | BROOKS | Victim 21 |
| December 2024 – February 2025 | HARRIS | Victim 17 |
| February 2025 | HARRIS, ROBINSON | Victim 17 |

41.  <u>Transportation of Minors – 18 U.S.C. § 2423</u>

On or about the date listed below, within the Central District of California and elsewhere, the defendant listed below, knowingly

transported the minor listed below, who had not attained the age of 18 years, in interstate and foreign commerce, with the intent that the minor engage in prostitution and any sexual activity for which any person could be charged with a criminal offense, in violation of Title 18, United States Code, Section 2423(a).

| Dates | Defendant(s) | Minor |
|---|---|---|
| February 2025 | HARRIS | Victim 17 |

42.  All in violation of 18 U.S.C. § 1962(d).

1

                              COUNT TWO

2                    [18 U.S.C. § 1591(a)(1), (b)(1)]

3                          [DEFENDANT AMOAKO]

4        43.  The Grand Jury realleges paragraphs 1 through 34 of this

5   Indictment here.

6        44.  Beginning in or around April 2022 and continuing through on

7   or about June 17, 2023, in Los Angeles County, within the Central

8   District of California, and elsewhere, defendant AMOAKO, in and

9   affecting interstate and foreign commerce, knowingly recruited,

10  enticed, harbored, transported, provided, obtained, and maintained by

11  any means Victim 2, knowing and recklessly disregarding that means of

12  force, threats of force, fraud, and coercion, as defined in Title 18,

13  United States Code, Section 1591(e)(2), and any combination of such

14  means, would be used to cause Victim 2 to engage in a commercial sex

15  act.

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THREE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT EVANS]

45.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

46.  Beginning in or around December 2022 and continuing through on or about January 5, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant EVANS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 4, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 4 to engage in a commercial sex act.

COUNT FOUR

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ISREL]

47.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

48.  Beginning in or around December 2022 and continuing through on or about February 17, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISREL, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 3, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 3 to engage in a commercial sex act.

COUNT FIVE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT AMOAKO]

49.   The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

50.   Beginning in or around April 2023 and continuing through on or about March 1, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant AMOAKO, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 5, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 5 to engage in a commercial sex act.

COUNT SIX

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ROBINSON]

51.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

52.  Beginning in or around June 2023 and continuing through in or around August 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROBINSON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 6, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 6 to engage in a commercial sex act.

COUNT SEVEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT ROBINSON]

53.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

54.  In or around July 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROBINSON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 7, a then-16-year-old girl, having had reasonable opportunity to observe Victim 7 and knowing and in reckless disregard that Victim 7 was under the age of 18 years old and knowing and in reckless disregard that Victim 7 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 7, knowing that Victim 7 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT EIGHT

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT PHILLIPS]

55.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

56.  Beginning in or around September 2023 and continuing through on or about February 28, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant PHILLIPS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 8, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 8 to engage in a commercial sex act.

COUNT NINE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT PHILLIPS]

57.  The Grand Jury realleges paragraphs 1 through 34 of this
Indictment here.

58.  Beginning in or around September 2023 and continuing
through on or about February 28, 2024, in Los Angeles County, within
the Central District of California, and elsewhere, defendant
PHILLIPS, in and affecting interstate and foreign commerce, knowingly
recruited, enticed, harbored, transported, provided, obtained, and
maintained by any means Victim 9, knowing and recklessly disregarding
that means of force, threats of force, fraud, and coercion, as
defined in Title 18, United States Code, Section 1591(e)(2), and any
combination of such means, would be used to cause Victim 9 to engage
in a commercial sex act.

COUNT TEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT ARMSTEAD]

59.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

60.  In or around April 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARMSTEAD, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 11, a then-14-year-old girl, having had reasonable opportunity to observe Victim 11 and knowing and in reckless disregard that Victim 11 was under the age of 18 years old and knowing and in reckless disregard that Victim 11 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 11, knowing that Victim 11 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ELEVEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT YOUNG]

61.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

62.  Beginning in or around June 2024 and continuing through July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 13, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 13 to engage in a commercial sex act.

COUNT TWELVE

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

63.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

64.  Beginning in or around June 2024 and continuing through July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 12, a then-17-year-old girl, having had reasonable opportunity to observe Victim 12 and knowing and in reckless disregard that Victim 12 was under the age of 18 years old and knowing and in reckless disregard that Victim 12 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 12, knowing that Victim 12 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT HARRIS]

65.  The Grand Jury realleges paragraphs 1 through 34 of this
Indictment here.

66.  In or around July 2024, in Los Angeles County, within the
Central District of California, and elsewhere, defendant HARRIS, in
and affecting interstate and foreign commerce, knowingly recruited,
enticed, harbored, transported, provided, obtained, and maintained an
individual who had not yet attained the age of 18 years, namely,
Victim 15, a then-17-year-old girl, having had reasonable opportunity
to observe Victim 15 and knowing and in reckless disregard that
Victim 15 was under the age of 18 years old and knowing and in
reckless disregard that Victim 15 would be caused to engage in a
commercial sex act, as defined in Title 18, United States Code,
Section 1591(e)(3), and knowingly advertised Victim 15, knowing that
Victim 15 was under the age of 18 years old and would be caused to
engage in a commercial sex act, as defined in Title 18, United States
Code, Section 1591(e)(3).

122

COUNT FOURTEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

67.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

68.  In or around July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 14, a then-15-year-old girl, having had reasonable opportunity to observe Victim 14 and knowing and in reckless disregard that Victim 14 was under the age of 18 years old and knowing and in reckless disregard that Victim 14 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 14, knowing that Victim 14 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT FIFTEEN

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT YOUNG]

69.   The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

70.   On or about July 9, 2024, in Los Angeles County, within the Central District of California, defendant YOUNG, knowingly employed, used, persuaded, induced, enticed, and coerced Victim 14, a then-15-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce, and which visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

COUNT SIXTEEN

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT YOUNG]

71.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

72.  On or about July 18, 2024, in Los Angeles County, within the Central District of California, defendant YOUNG, knowingly employed, used, persuaded, induced, enticed, and coerced Victim 14, a then-15-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce, and which visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

COUNT SEVENTEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT YOUNG]

73.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

74.  Beginning in or around August 2024 and continuing through on or about February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 22, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 22 to engage in a commercial sex act.

COUNT EIGHTEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT BROOKS]

75.  The Grand Jury realleges paragraphs 1 through 34 of this
Indictment here.

76.  Beginning in or around December 2024 and continuing through
in or around April 2025, in Los Angeles County, within the Central
District of California, and elsewhere, defendant BROOKS, in and
affecting interstate and foreign commerce, knowingly recruited,
enticed, harbored, transported, provided, obtained, and maintained an
individual who had not yet attained the age of 18 years, namely,
Victim 21, a then-17-year-old girl, having had reasonable opportunity
to observe Victim 21 and knowing and in reckless disregard that
Victim 21 was under the age of 18 years old and knowing and in
reckless disregard that Victim 21 would be caused to engage in a
commercial sex act, as defined in Title 18, United States Code,
Section 1591(e)(3), and knowingly advertised Victim 21, knowing that
Victim 21 was under the age of 18 years old and would be caused to
engage in a commercial sex act, as defined in Title 18, United States
Code, Section 1591(e)(3).

COUNT NINETEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT BROOKS]

77.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

78.  Beginning in or around December 2024 and continuing through in or around April 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant BROOKS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 21, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 21 to engage in a commercial sex act.

COUNT TWENTY

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT HARRIS]

79.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

80.  Beginning in or around December 2024 and continuing through in or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARRIS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 17, a then-16 and later 17-year-old girl, having had reasonable opportunity to observe Victim 17 and knowing and in reckless disregard that Victim 17 was under the age of 18 years old and knowing and in reckless disregard that Victim 17 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 17, knowing that Victim 17 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY-ONE

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT HARRIS]

81.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

82.  On or about January 29, 2025, in Los Angeles County, within the Central District of California, defendant HARRIS, knowingly employed, used, persuaded, induced, enticed, and coerced Victim 17, a then-16-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, and which visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

COUNT TWENTY-TWO

[18 U.S.C.  1591(a)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

83.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

84.  In or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained an individual who had not yet attained the age of 18 years, namely, Victim 20, a then-16-year-old girl, having had reasonable opportunity to observe Victim 20 and knowing and in reckless disregard that Victim 20 was under the age of 18 years old and knowing and in reckless disregard that Victim 20 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and knowingly advertised Victim 20, knowing that Victim 20 was under the age of 18 years old and would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY-THREE

[18 U.S.C. § 2423(a)]

[DEFENDANT HARRIS]

85.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

86.  In and around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARRIS knowingly transported Victim 17, who had not attained the age of 18 years, in interstate and foreign commerce, with the intent that Victim 17 engage in prostitution and sexual activity for which any person can be charged with a criminal offense, namely, Child Sex Trafficking, in violation of Arizona Revised Statutes Section 13-3212, and Human Trafficking for Sexual Servitude, in violation of Colorado Revised Statutes Section 18-3-504.

COUNT TWENTY-FOUR

[18 U.S.C. §§ 1591(a)(1), (b)(1); 2(a)]

[DEFENDANTS ROBINSON AND HARRIS]

87.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

88.  In or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants ROBINSON and HARRIS, each aiding and abetting the other, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 17, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 17 to engage in a commercial sex act.

COUNT TWENTY-FIVE

[21 U.S.C. § 846]

[DEFENDANTS ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, ROBINSON]

89.   The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

90.   Beginning on an unknown date and continuing through in or around April 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, and ROBINSON, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally (i) possess with intent to distribute, and (ii) distribute, the following controlled substances:

a.   Oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a), (b)(1)(C);

b.   Promethazine with Codeine, a Schedule V controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(3); and

c.   Marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

91.   The objects of the conspiracy were to be accomplished, in substance, as follows:

a.   Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, ROBINSON, and others known and unknown to the Grand Jury, would supply each other with narcotics to be distributed to

134

Enterprise members' sex trafficking victims to recruit them, gain or maintain their victims' compliance, and breed addiction that engendered dependency on their trafficker, thereby aiding the continuous sex trafficking of victims.

b.    Defendants ARMSTEAD, EVANS, AMOAKO, and others known and unknown to the Grand Jury, would store their drug supplies in hotels, including the Stadium Inn, in rooms where they sex trafficked their victims.

c.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, and others known and unknown to the Grand Jury, would supply and offer to supply each other with narcotics to be distributed to third party customers.

d.    Defendant HARRIS would solicit co-conspirators, including defendant EVANS, to post advertisements for narcotics on Instagram, on behalf of defendant HARRIS, and in exchange, defendant HARRIS would sell narcotics to defendant EVANS at a discounted price.

e.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, and others known and unknown to the Grand Jury, would inform each other when they sold or acquired narcotics supplies.

f.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, and others known and unknown to the Grand Jury, would use violence and intimidation to control narcotics trafficking in its territory.

g.    Defendants ARMSTEAD and EVANS, and others known and unknown to the Grand Jury, would obtain, possess, store, share, and use firearms and ammunition to maintain and strengthen the Hoovers Enterprise's control over the narcotics trafficking occurring within its territory, including in strategically beneficial locations,

including Hoovers strongholds like the Stadium Inn where members
would need firearms protect themselves and their product while
engaged in drug trafficking.

C.    OVERT ACTS

92.  On or about the following dates, in furtherance of the
conspiracy and to accomplish its object, defendants ARMSTEAD, EVANS,
AMOAKO, HARRIS, YOUNG, BROOKS, and ROBINSON, and others known and
unknown to the Grand Jury, committed the following overt acts, among
others, within the Central District of California and elsewhere:

The Grand Jury realleges overt acts 4, 12, 18, 19, 20, 70, 84,
113, 116, 121, 126, 127, 133, 134, 139, 147, 153, 154, 162, 164, 165,
166, 168, 173, 174, 175, 176, 180, 183, 188, 199, 200, 210, 215, 252,
256, 261, 262, 268, 280, 289, 302, 326, 335, 358, 363, 370, and 384
of Count One of this Indictment.

COUNT TWENTY-SIX

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT AMOAKO]

93.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

94.  On or about February 9, 2024, defendant AMOAKO knowingly conducted a financial transaction, that is, a $10 Cash App payment to Victim 26 with a subject line specifying "condoms," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the sex trafficking of Victim-C.W. by force, threats of force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1), Travel Act Pimping, in violation of Title 18, United States Code, Section 1952(a)(3), (b)(1), and Pimping, in violation of California Penal Code Section 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, defendant's pimping of Victim 26, in violation of 18 U.S.C. § 1952(a)(3),(b)(1) (Travel Act) and California Penal Code § 266h.

COUNT TWENTY-SEVEN

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT EVANS]

95.   The Grand Jury realleges paragraphs 1 through 34 of this
Indictment here.

96.   On or about March 17, 2022, defendant EVANS knowingly
conducted a financial transaction, that is, a $300 Cash App payment
to Victim 4, knowing that the property involved in the transaction
represented the proceeds of some form of unlawful activity, and which
property was, in fact, the proceeds of specified unlawful activity,
namely, pimping Victim 27, in violation of 18 U.S.C.
§ 1952(a)(3),(b)(1) (Travel Act) and California Penal Code § 266h,
with the intent to promote the carrying on of additional specified
unlawful activity, namely, defendant EVANS's sex trafficking of
Victim 4 by force, fraud, or coercion, in violation of 18 U.S.C.
§ 1591(a)(1), (b)(1), and pimping of Victim 4, in violation of 18
U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code
§ 266h.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-EIGHT

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT BROOKS]

97.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

98.  On or about December 6, 2024, defendant BROOKS knowingly conducted a financial transaction, that is, a $330 Cash App payment to Victim 28 with a subject line specifying "room," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, pimping Victim 10, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, pimping Victim 28 in violation of 18 U.S.C. § 1952(a)(3) (Travel Act) and California Penal Code § 266h.

COUNT TWENTY-NINE

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT CROCKHAM]

99.  The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

100. On or about December 30, 2024, defendant CROCKHAM knowingly conducted a financial transaction, that is, a Cash App payment of $12 to Victim 30 with a memo line "Uber to room," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, pimping Victim 29, in violation of 18 U.S.C. § 1952(a)(3) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, pimping Victim 28, in violation of 18 U.S.C. § 1952(a)(3) (Travel Act) and California Penal Code § 266h.

COUNT THIRTY

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT ISREL]

101. The Grand Jury realleges paragraphs 1 through 34 of this
Indictment here.

102. On or about May 12, 2023, defendant ISREL knowingly
conducted a financial transaction, that is, a Cash App payment of $40
to Victim 32 with a subject line specifying "uber," knowing that the
property involved in the transaction represented the proceeds of some
form of unlawful activity, and which property was, in fact, the
proceeds of specified unlawful activity, namely, sex trafficking
Victim 3 through force, threats of force, fraud, and coercion, in
violation of 18 U.S.C. § 1591(a)(1), (b)(1) and pimping Victim 3, in
violation of California Penal Code § 266h, with the intent to promote
the carrying on of additional specified unlawful activity, namely,
sex trafficking Victim 1 through force, fraud, and coercion, in
violation of violation of 18 U.S.C. § 1591(a)(1), (b)(1), and pimping
Victim 32, in violation of 18 U.S.C. § 1952(a)(3) (Travel Act) and
California Penal Code § 266h.

COUNT THIRTY-ONE

[18 U.S.C. §§ 932(b)(1), (b)(2)]

[DEFENDANT ISREL]

103. The Grand Jury realleges paragraphs 1 through 34 of this Indictment here.

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

104. Defendant ISREL was a resident of both Los Angeles, California, within the Central District of California, and Las Vegas, Nevada.

105. Co-Conspirator 1 was a resident of Los Angeles, California, within the Central District of California, and Las Vegas, Nevada.

106. Defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, namely:

    a.    Carrying a Concealed Firearm, in violation of California Penal Code Section 25400(a)(2), in the Superior Court of the State of California, County of Los Angeles, Case Number TA133991, on or about November 4, 2014; and

    b.    Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court of the State of California, County of Los Angeles, Case Number BA487254, on or about October 13, 2021.

B.    OBJECT OF THE CONSPIRACY

107. Beginning on or about November 24, 2023 and continuing until on or about February 27, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISREL conspired with Co-Conspirator 1 for Co-Conspirator 1 to knowingly

142

purchase two firearms, namely, a Micro Draco pistol, serial number 23PMD-47926 (the "Draco Pistol") and a Five-Seven pistol, serial number 386445475 (the "FN Pistol"), each in and affecting interstate and foreign commerce, for, on behalf of, and at the request and demand of defendant ISREL, knowing and having reasonable cause to believe that defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 932(b)(1).

C.    MANNER AND MEANS OF THE CONSPIRACY

108. The object of the conspiracy was to be accomplished, in substance, as follows:

a.    Defendant ISREL would identify to Co-Conspirator 1 the firearms that he wanted her to purchase on his behalf.

b.    Co-Conspirator 1 would purchase firearms for, on behalf of, and at the request and demand of defendant ISREL from a Federal Firearm Licensee ("FFL") located in Las Vegas, Nevada.

c.    Co-Conspirator 1 would represent to the FFL that she was the actual buyer of the firearms when in reality Co-Conspirator 1 was purchasing the firearms for, on behalf of, and at the request and demand of defendant ISREL, knowing and having reason to believe that defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year.

d.    Defendant ISREL or Co-Conspirator 1 would transport the firearms to Los Angeles, where they both lived part-time.

e.    Defendant ISREL would possess these firearms in Los Angeles, including using one of them in a music video he filmed in Los Angeles.

D.    OVERT ACTS

109. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant ISREL, Co-Conspirator 1, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On November 24, 2023, in or around Los Angeles, California, using direct messages on Instagram, defendant ISREL sent Co-Conspirator 1 a photograph depicting a Century Arms Mini Draco Pistol along with coded messages indicating that he wanted this gun and that it cost $1,100.

Overt Act No. 2:    On November 24, 2023, using direct messages on Instagram, Co-Conspirator 1 replied that she did not really "know guns" but that he should get it if it was a good price and he wanted it.

Overt Act No. 3:    On February 13, 2024, Co-Conspirator 1 purchased the Draco Pistol, serial # 23PMD-47926 and the FN Pistol, serial # 386445475, from an FFL in Henderson, Nevada.

Overt Act No. 4:    After Co-Conspirator 1 purchased the Draco Pistol and FN Pistol on February 13, 2024, defendant ISREL paid Co-Conspirator 1 $1,100 in three Cash App payments between February 17, 2024 and February 27, 2024, which was the purchase price defendant ISREL quoted for the Draco Pistol in his Instagram messages to Co-Conspirator 1.

Overt Act No. 5:    Between February 14, 2024, and May 14, 2024, defendant ISREL filmed a music video in Los Angeles in which defendant ISREL possessed and brandished the Draco Pistol.

Overt Act No. 6:    Between February 14, 2024, and May 14, 2024, Co-Conspirator 1 filmed a video of herself holding the FN Pistol in her lap.

Overt Act No. 7:    On May 19, 2024, in Las Vegas, Nevada, defendant ISREL, a convicted felon, possessed the FN Pistol in a vehicle.

1    FORFEITURE ALLEGATION ONE

2    [18 U.S.C. § 1963]

3    1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice

4    is hereby given that the United States of America will seek

5    forfeiture as party of any sentence, pursuant to Title 18, United

6    States Code, Section 1963, and Title 28 United States Code, Section

7    2461(c), in the event of any defendant's conviction of the offense

8    set forth in Count One of this Indictment.

9    2.    Any defendant so convicted shall forfeit to the United

10   States of America the following:

11        (a)   Any interest the convicted defendant has acquired or

12   maintained as a result of such offense;

13        (b)   Any interest in, security of, claim against, or

14   property or contractual right of any kind affording a source or

15   influence over, any enterprise which the convicted defendant has

16   established, operated, controlled, conducted, or participated in the

17   conduct of, as a result of such offense;

18        (c)   Any property constituting, or derived from, any

19   proceeds which the person obtained, directly or indirectly, from

20   racketeering activity as a result of any such offense; and

21        (d)   To the extent such property is not available for

22   forfeiture, a sum of money equal to the total value of the property

23   described in subparagraphs (a), (b), and (c).

24   3.    Pursuant to Title 18, United States Code, Section 1963(m),

25   any defendant so convicted shall forfeit substitute property, up to

26   the total value of the property described in the preceding paragraph

27   if, as the result of any act or omission of said defendant, the

28   property described in the preceding paragraph, or any portion thereof

146

(a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1          FORFEITURE ALLEGATION TWO

2              [18 U.S.C. § 1594(d)]

3      1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 1594(d), in the event of any defendant's

7  conviction of any of the offenses set forth in any of Counts Two

8  through Fourteen, Seventeen through Twenty, Twenty-Two and Twenty-

9  Four of this Indictment.

10     2.   Any defendant so convicted shall forfeit to the United

11  States of America the following:

12          (a)   Any property, real or personal, that was involved

13  in, used, or intended to be used to commit or to facilitate the

14  commission of such violation, and any property traceable to such

15  property;

16          (b)   Any property, real or personal, constituting or

17  derived from, any proceeds that such person obtained, directly or

18  indirectly, as a result of such violation, or any property traceable

19  to such property; and

20          (c)   In the event such property is not available for

21  forfeiture, a sum of money equal to the total value of the property

22  described in subparagraphs (a) and (b).

23

24

25

26

27

28

1

                        FORFEITURE ALLEGATION THREE

2

                          [18 U.S.C. § 2253]

3      1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 2253, in the event of any defendant's

7   conviction of the offenses set forth in any of Counts Fifteen,

8   Sixteen, or Twenty-One of this Indictment.

9      2.   Any defendant so convicted shall forfeit to the United

10  States of America the following property:

11      (a)  All right, title, and interest in any visual depiction

12  involved in any such offense, or any book, magazine, periodical, film

13  videotape, or other matter which contains any such visual depiction,

14  which was produced, transported, mailed, shipped or received and

15  involved in any such offense;

16      (b)  All right, title, and interest in any property, real

17  or personal, constituting or traceable to gross profits or other

18  proceeds obtained from such offense;

19      (c)  All right, title, and interest in any property, real

20  or personal, used or intended to be used to commit or to promote the

21  commission of such offense or any property traceable to such

22  property; and

23      (d)  To the extent such property is not available for

24  forfeiture, a sum of money equal to the total value of the property

25  described in subparagraphs (a), (b), and (c).

26      3.   Pursuant to Title 21, United States Code, Section 853(p), as

27  incorporated by Title 18, United States Code, Section 2253(b), any

28  defendant so convicted shall forfeit substitute property, up to the

total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 2428]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 2428, in the event of the defendant's conviction of the offenses set forth in Count Twenty-Three of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following property:

(a) All right, title, and interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such offense;

(b) All right, title, and interest in any property, real or personal, constituting or derived from any proceeds obtained directly or indirectly from such offense; and

(c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18 Section 2428(b)(2), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1          FORFEITURE ALLEGATION FIVE

2              [21 U.S.C. § 853]

3      1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 21,

6  United States Code, Section 853 and Title 28, United States Code,

7  Section 2461(c), in the event of any defendant's conviction of the

8  offense set forth in Count Twenty-Five of this Indictment.

9      2.    Any defendant so convicted shall forfeit to the United

10  States of America the following:

11          (a)   All right, title and interest in any and all property,

12  real or personal, constituting or derived from, any proceeds which

13  the defendant obtained, directly or indirectly, from such offense;

14          (b)   All right, title and interest in any and all property,

15  real or personal, used, or intended to be used, in any manner or

16  part, to commit, or to facilitate the commission of such offense; and

17          (c)   To the extent such property is not available for

18  forfeiture, a sum of money equal to the total value of the property

19  described in subparagraphs (a) and (b).

20      3.    Pursuant to Title 21, United States Code, Section 853(p),

21  any defendant so convicted shall forfeit substitute property if, by

22  any act or omission of said defendant, the property described in the

23  preceding paragraph, or any portion thereof: (a) cannot be located

24  upon the exercise of due diligence; (b) has been transferred, sold

25  to, or deposited with a third party; (c) has been placed beyond the

26  jurisdiction of the court; (d) has been substantially diminished in

27  value; or (e) has been commingled with other property that cannot be

28  divided without difficulty.

1          FORFEITURE ALLEGATION SIX

2          [18 U.S.C. §§ 934 and 924]

3     1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Sections 934(a)(1) and 924(d), in the event of

7  the defendant's conviction of the offense set forth in Count Twenty-

8  Six of this Indictment.

9     2.   The defendant, if so convicted, shall forfeit to the United

10  States of America the following:

11          (a)  All right, title, and interest in any property

12  constituting, or derived from, any proceeds obtained, directly or

13  indirectly, as the result of such violation;

14          (b)  All right, title, and interest in any property used,

15  or intended to be used, in any manner or part, to commit, or to

16  facilitate the commission of, such violation;

17          (c)  All right, title, and interest in any firearm or

18  ammunition involved in or used in any such offense; and

19          (d)  To the extent such property is not available for

20  forfeiture, a sum of money equal to the total value of the property

21  described in subparagraph (a).

22          3.   Pursuant to Title 21, United States Code, Section

23  853(p), as incorporated by Title 28, United States Code, Section

24  2461(c), the defendant, if so convicted, shall forfeit substitute

25  property, up to the value of the property described in the preceding

26  paragraph if, as the result of any act or omission of the defendant,

27  the property described in the preceding paragraph or any portion

28  thereof (a) cannot be located upon the exercise of due diligence; (b)

1   has been transferred, sold to, or deposited with a third party; (c)

2   has been placed beyond the jurisdiction of the court; (d) has been

3   substantially diminished in value; or (e) has been commingled with

4   other property that cannot be divided without difficulty.

5

6                                    A TRUE BILL

7

8                                    /S/
                                     _____
9                                    Foreperson

10  BILAL A. ESSAYLI
    Acting United States Attorney
11

12  *Christina Shay*

13  CHRISTINA T. SHAY
    Assistant United States Attorney
14  Chief, Criminal Division

15  JOSHUA O. MAUSNER
    Assistant United States Attorney
16  Chief, Violent and Organized
    Crime Section
17
    CHELSEA NORELL
18  Assistant United States Attorney
    Deputy Chief, Violent and
19  Organized Crime Section

20  MIRELLE RAZA
    Assistant United States Attorney
21  General Crimes Section

22

23

24

25

26

27

28

                                    155